·THE STATE v. EDWARDS, *Appellant:*

1.  **Murder**: INSTRUCTION. The jury was instructed that although they " might believe from the evidence that defendant, *at the time he shot into the crowd of people mentioned by the witnesses*, did not intend to kill or murder any particular person, yet if they found from the testimony that defendant, at, &c., on, &c., did purposely and intentionally shoot into said crowd of people, with a certain revolver, loaded     *     *     and that the breast of W. McK. was penetrated and wounded by the ball, &c., in consequence of which W. McK. died," they should convict.  *Held*, that the instruction could not fairly be construed to assume, as a fact, that defendant shot into the crowd.  *Held*, also, that if it could be so construed it would not be objectionable, as the fact was not controverted at the trial.

2.  **Intentional Homicide** : SHOOTING INTO A CROWD : PRESUMPTION OF MALICE. If one purposely and intentionally shoots into a crowd of people without intending to kill any particular person, but does kill one of the crowd, the law will presume that the killing was intentionally and maliciously done, and the perpetrator will be guilty of murder in the second degree.

3.  **Murder**: DRUNKENNESS AS BEARING ON THE QUESTION OF INTENT. The fact that the defendant in a murder case was drunk when he committed the homicide, is not to be considered by the jury in determining the question of intent. HENRY, J., dissenting.

4.  **Instructions in case of Homicide.** Upon a trial for homicide it is the duty of the court to instruct only as to such grades of homicide as the evidence would apply to. If the evidence shows that

the defendant, if guilty at all, is guilty of something else beside manslaughter, the court should not instruct as to that offense.

*Appeal from Linn Circuit Court.*—Hon. G. D. BURGESS, Judge.

AFFIRMED.

*A. W. Mullins* and *Geo. W. Easley* for appellant.

*J. L. Smith*, Attorney-General, for the State.

NORTON, J.—The defendant was indicted, in the circuit court of Linn county, for murder in the second degree, for killing William McKinley on the 4th day of July, 1878. On the trial of the same at the June term, 1879, of said court, he was convicted of murder in the second degree, and his punishment assessed to ten years' imprisonment in the penitentiary. Motion for new trial having been overruled, defendant brings the case before us on appeal. A reversal of the judgment is sought, because of alleged errors committed by the trial court in giving and refusing instructions; and, before considering the objections urged, we deem it proper to insert the evidence given on the trial in order to a proper determination of them.

On the part of the State, witness Macklin testified that he had for several years last past been a resident of the town of Laclede, Linn county, State of Missouri; that he was acquainted with the defendant, James C. Edwards; that, on the 4th day of July, 1878, about sunset, witness was in the public park in said town, near the music stand, and noticed defendant lying on the ground a short distance from said music stand. In a few minutes afterward witness saw defendant rise to his feet. Anderson Thomas and Al. Hall (a colored man) were trying to get him up. When defendant got on his feet, they gave back from him, and defendant remarked : " By God, I will see who is doing this." He drew a revolver, and holding it in both hands, tried to cock it, but at the first attempt his thumb slipped.

In the meantime the crowd were falling back from both sides in front of defendant. Defendant made another attempt, drew back the hammer of his revolver, and shot right into the crowd northwest of him. I cannot give the number of persons in the crowd. They were tolerably thick, passing to and fro. Defendant was standing up and leaning forward when he shot. As soon as he fired his revolver, he started forward to the boy, William McKinley, who was shot, kneeled by him and commenced fanning him with his hat. I saw the ball hole in the boy's breast. He only breathed two or three times, and then died. This occurred in Linn county, and State of Missouri.

On cross-examination, witness testified that the boy was thirty or forty feet from Edwards at the time he shot, and witness supposed there were a dozen other boys nearer the defendant and in the same general direction at the time he shot. Defendant was standing, probably, as much as two minutes before he shot; was facing toward the northwest, and the pistol was discharged in the same general direction. He held the pistol across his left hand, holding it in his right hand at the time he discharged it. McKinley had not been about Edwards, to my knowledge. When I came from my supper and went into the park, I saw defendant lying on the ground; do not know how long he had been lying there. The colored boy, Al. Hall, was standing three or four steps in a northwest direction from defendant when he fired. The boy who was killed was about thirteen years old, and small of his age. When defendant was fanning the boy, he lamented what he had done. The colored boy, Al. Hall, stepped back three or four steps when Edwards got up. When Edwards got out his pistol, Al. Hall ran in a northwest direction to the corner of the lemonade stand. About the time Hall got to the corner of the stand the pistol was fired. The corner of the lemonade stand is about eighteen feet from where Edwards discharged his pistol. The place where the boy fell is about twenty-nine feet from where Edwards dis-

charged his pistol. The corner of the lemonade stand was about one foot and a half west of a line from where Edwards was standing to the place where the boy fell.

A. H. Love testified that he was marshal of the town of Laclede on the 4th day of July, 1878. As I passed Dr. Standley's office on the evening of said day, Dr. Standley informed me that defendant was lying down in the park drunk, and that he needed looking after. I crossed the street and passed through the gate into the park, and had gone about twenty feet when I saw the crowd scatter, some going east, some north and some west from where defendant was lying. Defendant got up, made two or three steps in a northwest direction, pulled out his revolver and fired it off. He seemed to have hold of the revolver with both hands. He fired in a northwest direction, where the crowd appeared to be most dense. After Edwards fired, he ran as fast as he could in the direction in which he fired. I followed, and when I came up to him he was kneeling by the side of William McKinley and fanning him with a hat or cap. Willie appeared to be dying. I let Edwards alone until the boy was dead. I then took defendant by the arm and told him to give me his revolver, which he did. I then took him before G. W. Freeman, a justice of the peace. That night I took him to Linneus, in company with Peter Chappell and Peter F. Felt. On the way to Linneus, defendant stated that the killing of the boy was an accident, and that it would not have happened had the boys not bothered him. He said he was not in the habit of carrying a revolver; that he had gone home and got this revolver because of a fuss he had had with Mr. Dysart; that, when he fired, he had intended to shoot Al. Hall, but that he did not intend to kill Hall.

On cross-examination, witness testified that Willie McKinley was twenty to twenty-five feet from Edwards at the time he shot, and that Al. Hall was six or eight feet from Edwards, in a northwest direction. The shooting occurred between seven and eight o'clock on the evening of

July 4th, 1878. On the way to Linneus, Edwards stated that he shot at Al. Hall, but said he did not intend to kill him, or hit him, I cannot say which.

Al. Hall testified that he was in the park on the evening of July 4th, 1878; that Thornburgh told him to go and get defendant up, and take him down to the stable. I went and took hold of Edwards, but could not wake him. Then Mr. Thomas came up and tried to wake him, and witness did nothing more to him. Bennie Edwards, who is a nephew of defendant, and about five or six years old, then came up and said: "Grand-pa says pour cold water on him, and that will wake him." When he said this, defendant jumped up and said: "By God, I am going to see who is doing this," or something of that kind. Defendant then jerked a revolver from his pocket. I then jumped to one side, but got a little way, when I saw him straighten out his hand and shoot. Defendant went in the direction he shot until he came to where the boy was lying. When the defendant got there, he said he did not do that on purpose; that he did it accidentally; that accidents will happen. The boy shot was Willie McKinley. The last I saw of Edwards he was fanning the boy with a hat or cap. When Edwards fired the shot, I was a little to one side of him. There were nine or ten little boys standing in the direction in which Edwards shot.

Peter F. Felt testified that he did not see the shooting, but saw the defendant a short time thereafter. Was one of the parties that accompanied Edwards to Linneus that evening. On our way to Linneus defendant said he regretted that he had shot McKinley; said that he got the revolver on account of a fuss with Dysart. He seemed very sorry and said that the killing was an accident. He said he aimed to shoot Al. Hall, but afterward said he was just in fun and aimed to shoot down in the ground.

E. M. Tracy testified that he was in the park at the time the boy was shot; that there was quite a crowd of people in the park, several hundred; saw the boy fall, and

heard him say he was hurt; just as he fell; did not see defendant shoot. There did not appear to be much of a crowd in the direction of the shooting. The main portion of the crowd appeared to be south.

Oscar Mitchell testified that he was in the park at Laclede on the 4th day of July, 1878. He (defendant) was lying on the ground apparently asleep. I saw defendant get up, fire his revolver, and the boy fall. There were a number of children near where the boy was shot, no men that I noticed. The main crowd was west of the defendant when he shot.

Defendant offered the following evidence : A. Thomas testified that he was in the park in Laclede on the 4th day of July, 1878. When witness first saw defendant he was lying in the park and a lot of little boys were plaguing him and throwing water on him. Witness went to him and told him to get up. He got up on his feet, stepped two or three steps and fired, holding the pistol in both hands.

Thomas Murrin, a witness for defendant, testified that he was present in the park at Laclede on the 4th day of July, 1878, and saw Edwards lying on the ground in said park. Quite a number of little boys were annoying defendant when I first saw him. When he arose to his feet and fired, witness thought he was asleep, for he could notice that his eyes were shut  As soon as the pistol went off he opened his eyes, went forward to where the boy had fallen and commenced fanning him. Cross-examination : I did not see the pistol in his hands. I did not see Geo. W. Macklin. I was watching his eyes. I was standing in front of the dance stand with one foot upon the platform. I noticed that he did not open his eyes until he shot, and then he opened his eyes and ran to the boy.

W. W. Hoskins, a witness for defendant, testified as follows: I was standing about twenty feet west of defendant when he shot, and could see him plainly. He acted as if he did not know what he was doing when he fired

the shot. He held the pistol in both hands when it was discharged. This occurred on the evening of July 4th, 1878, at the park in Laclede, Linn county, Missouri.

Defendant, James C. Edwards, in his own behalf, testified that he resided at Laclede, Linn county, Missouri; that on the night of the 3rd day of July, 1878, he had been up the greater portion of the night in charge of his father's livery stable; that on the 4th day of July, 1878, he was driving a hack all day from Laclede to the camp grounds, about half a mile west of Laclede; that the day was warm and dusty, and that he continued to drive said hack until six o'clock in the evening, when he put up his team and got his supper. Defendant further stated that he was not, nor had he been, in the habit of carrying a revolver, and that the way he happened to have one on the evening of the 4th day of July, 1878, was that two or three days previously some colored men had one of his father's buggies, and after the buggy was returned he found this revolver in it and took the same home with him. After eating my supper I took the revolver down town with the intention of giving it to the owner. After going down town I drank two or three glasses of beer, then went to the park; a short distance from the stand I lay down upon the ground and watched them dance one set; then fell asleep; and have some recollection of some one pouring water on me, some of which went into my ear. Shortly afterward some more water was poured on me, and from this time I had no recollection of anything that transpired until the revolver was discharged. There was never any ill-feeling existing between Mr. Dysart and myself, or Al. Hall and myself. Had no intention of hurting the boy, or any one else. Did not know that Al. Hall was in the park until after the revolver was discharged.

At the close of the evidence, the court gave the following instructions on behalf of the State:

1. The jury are instructed that, if they believe from the evidence, beyond a reasonable doubt, that the defend-

ant, in Linn county, on the 4th day of July, 1878, willfully, and of his malice aforethought, killed William McKinley, in the manner and by the means specified in the indictment, they will find him guilty of murder in the second degree, and assess his punishment at not less than ten years in the State penitentiary.

2. Willfully, as here used, means intentionally. Malice aforethought, as here used, means a wickedness of purpose previously formed, though it need not be formed but for a moment.

3. If the jury find the defendant guilty of murder in the second degree, they will so state in their verdict.

4. The reasonable doubt mentioned in the instructions in this case, in order to justify an acquittal on that ground, must be a substantial doubt arising from the insufficiency of the evidence and not a mere possibility that defendant is not guilty.

5. Although the jury may believe from the evidence that the defendant, at the time he shot into the crowd of people mentioned by the witnesses in their testimony, did not intend to kill or murder any particular person, yet if they find from the testimony that the defendant, at the county of Linn on the 4th day of July, 1878, did purposely and intentionally shoot into said crowd or assemblage of people, with a certain revolver loaded with gunpowder and leaden ball, and that the breast of Wm. McKinley was penetrated and wounded by the ball so discharged from said revolver, and that by reason of the wound so inflicted by said ball, the said William McKinley did then and there die, then they will find the defendant guilty of murder in the second degree.

6. The jury are instructed that if they believe from the evidence, beyond a reasonable doubt, that the defendant, at the county of Linn, on the 4th day of July, 1878, willfully, and of his malice aforethought, shot at any person or persons, other than the said Wm. McKinley, with a certain revolver loaded with gunpowder and leaden

ball, the same being a deadly weapon likely to produce death or great bodily harm, and that by reason of said shot so discharged from said revolver, the said Wm. McKinley was then and there killed, then they will find the defendant guilty of murder in the second degree.

7. The jury are instructed that the words "malice aforethought," used in the instructions on both sides, mean a wicked purpose. These words, in the description of murder, do not imply deliberation or the lapse of considerable time between the malicious intent to take life and the actual execution of that intent, but they denote purpose and design in contradistinction to accident and mischance.

8. The jury are instructed that in making up their verdict they will entirely disregard all testimony of the witnesses with reference to the defendant's drunkenness at the time of shooting off his pistol, and that drunkenness cannot be pleaded in excuse or defense of any crime.

On behalf of the defendant, the court gave the following: 6. Before the jury can find the defendant guilty of murder in the second degree, they must believe from the evidence, and that beyond a reasonable doubt: First, that the defendant killed the said William McKinley as charged in the indictment, and secondly, that he did so willfully and intending at the time to do the act, or to do violence as against some other person.

9. If, after a full and deliberate investigation and consideration of all the facts and circumstances given in evidence, the jury entertain a reasonable doubt of the defendant's guilt, then it is their duty to acquit him.

10. If the jury shall believe from the evidence before them that the defendant, at the time he discharged the pistol or revolver that caused the death of William McKinley, was not conscious of firing said shot and did not know what he was doing, then in that event the jury should find the defendant not guilty under the indictment.

Defendant's instruction numbered 7, as asked by him, is as follows: 7. The burden of proof is upon the State to

establish by evidence, to the satisfaction of the jury and beyond a reasonable doubt, every ingredient necessary to constitute the defendant's guilt; and, in determining the fact as to whether or not the defendant intended to do the act imputed to him in killing William McKinley, the jury may take into consideration all the facts and circumstances in proof, including the defendant's physical and mental condition at that time.

The court refused to give said instruction, as asked, but modified the same by striking out the words "including the defendant's physical and mental condition at that time," and then gave the same as so modified.

The following instructions asked by defendant were refused: 1. Unless the jury believe from the evidence before them, and that beyond a reasonable doubt, that the defendant, with malice aforethought, did willfully shoot at William McKinley with the intention, at the time of so shooting, to kill said McKinley, as charged in the indictment, then the jury must acquit the defendant as to the charge of murder in the second degree.

2. If the jury shall believe from the evidence that the defendant discharged his revolver without intending at the time he did so to kill William McKinley or any other person, or if the jury believe from the evidence that said McKinley was killed by defendant unintentionally or accidentally, then, in either such case, the defendant is not guilty of murder in the second degree, and the jury should acquit him thereof.

8. The court instructs the jury that, whilst drunkenness is no justification or excuse for crime, nevertheless, if they find from the evidence that the defendant was, at the time he discharged the revolver and shot William McKinley, very much stupefied, weakened and disabled by intoxication, then the jury may take this fact into consideration in determining the question as to defendant's intention and purpose at the time he discharged said revolver.

Counsel for defendant insist upon a reversal of the

21—71

judgment because of alleged error committed by the court in giving, on behalf of the State, instructions numbered five and eight, and in refusing to give, on the part of defendant, instructions numbered two, seven and eight.

It is insisted that the fifth instruction is erroneous because it assumes the fact that defendant did shoot into a crowd of people assembled, and because it ignores the question of malice. While the instruction is open to verbal criticism, and if taken in detached portions, gives color to the objection made, yet when it is viewed altogether, the objection disappears. The fact claimed to be assumed in the instruction is "that defendant shot into a crowd of people mentioned by the witnesses." It cannot be said that the court assumed such fact, when, by the instruction, the jury are required to find from the testimony that defendant "did purposely and intentionally shoot into said crowd or assemblage of people." The instruction cannot, by any fair reading of it, be construed to assume a fact as found which the jury, by its terms, are expressly required to find from the evidence. Besides this, the fact that defendant did shoot off his revolver into the crowd assembled was not controverted, as all the witnesses who testified agreed as to this fact. The question in dispute was whether the shooting was intentionally or purposely done, and this fact the jury were required to find before they could convict.

*1. MURDER: instruction.*

The objection that it ignores the question of malice is not well taken. While it is true that there can be no murder in either degree without malice, express or implied, still, if the homicide was committed under the facts supposed in the instruction, the malice requisite to murder would be presumed, and the presumption that the defendant intended the probable consequences of such an act would also be indulged. A familiar illustration of this principle is afforded in the case of a workman who threw down a stone or piece of timber into the street, in a populous town, where people

*2. INTENTIONAL HOMICIDE: shooting into a crowd: presumption of malice.*

were continually passing, and killed a person. Such a killing is murder at the common law, for the law, in such a case, presumes the intent to kill. *State v. Wieners,* 66 Mo. 22; 1 East P. C.. 225, 231. It was, therefore, wholly unnecessary for the court, after telling the jury that, if they believed that defendant killed the deceased under the circumstances mentioned in the instruction, they should find him guilty of murder in the second degree, to instruct them that the law presumed that such killing was intentionally and maliciously done, for the reason that a homicide thus committed is murder of the second degree under our statute, and the jury were so directed in the instruction. It follows from what has been said that the first and second of defendant's instructions were properly refused.

The second instruction is misleading in its tendency, and, under the last clause of it, although the jury might believe that defendant shot at some other person than the deceased, and missing such person, killed the deceased, they would have been authorized to acquit. This, we think, is not the law.

It has been earnestly and with great plausibility argued by counsel that the court erred in refusing the eighth of defendant's instructions, which asked the court to tell the jury that they might take into consideration the intoxication of defendant in determining the question as to defendant's intention and purpose at the time he discharged the revolver. We have been cited to respectable authorities which maintain the correctness of the doctrine enunciated in the instruction. The authorities bearing upon the subject are conflicting, the courts of some States holding one way, and the courts of other States holding the other. It may, however, be said that the identical question presented by the instruction has heretofore been considered by this court, and it has invariably been held that intoxication or drunkenness can neither excuse nor extenuate a crime, and that it can not be taken into consideration by a jury for either

3. MURDER: drunkenness as bearing on the question of intent.

of such purposes. The question first arose in the case of the *State v. Harlow*, 21 Mo. 446, and was disposed of as above stated. It again arose in the case of the *State v. Cross*, 27 Mo. 332, where the subject was exhaustively discussed in an opinion by NAPTON, J., and the same conclusion reached. These cases were followed in the subsequent cases of *State v. Hundley*, 46 Mo. 416, and *State v. Dearing*, 65 Mo. 530. However differently the question may have been elsewhere determined, we are not disposed to overthrow the rule thus established in this State, believing it to rest upon reason and authority, and that any departure from it would neither be in the interest of a higher civilization, nor promotive of the best interests of society, nor conducive to the ends of justice.

Besides this, the instruction might well have been refused on the ground that there was no evidence on which to base it. The only evidence bearing on the question was that of witness Love, who stated " that Dr. Standley informed him that defendant was lying down in the park drunk, and that he needed looking after." This evidence was properly excluded from the consideration of the jury, in an instruction given on the part of the State, on the ground of its being hearsay, if upon no other ground.

It is also insisted that the court erred in not instructing the jury as to some of the grades of manslaughter. 4. INSTRUCTION IN CASE OF HOMICIDE. When a homicide is committed, it is the duty of the court to instruct only as to such grades of the homicide as the evidence would apply to; and, as the evidence adduced in this case did not apply to any of the degrees of manslaughter, no error was committed by the court in omitting to instruct in regard thereto. Judgment affirmed, SHERWOOD, C. J., and NAPTON, J., concurring, and HENRY and HOUGH, JJ., concurring in the result.

SEPARATE OPINION BY HENRY, J.—I concur in affirming the judgment, but dissent from so much of the foregoing opinion as relates to the eighth instruction asked by defendant and refused by the court. I do not think that

the question of drunkenness is anywhere in the case, except in the brief of counsel. There is not a particle of legitimate evidence tending to show that the defendant was intoxicated when the homicide occurred. The defendant testified that he drank two or three glasses of beer during that afternoon, but does not, nor does any other witness, state that he drank any alcoholic liquor. The instruction was, therefore, properly refused; but I do not agree that such an instruction should be refused when the evidence in a case establishes, or tends to establish, the fact that the accused was drunk when the alleged crime was committed. Such evidence is admissible, not for the purpose of excusing or extenuating a committed crime, but only to show that no crime was committed. The weight of authority and the elementary principles upon which criminal responsibility rests, favor its admission. That drunkenness may be feigned, is no reason for excluding the evidence. Insanity may be simulated—that is a matter for the jury to determine on the evidence.

In the *State v. Cross*, 27 Mo. 338, Judge Richardson, in his dissenting opinion, briefly, but clearly states the true doctrine on the subject: " Every homicide is not murder, but the quality of the offense depends upon the intent of the offender, and, therefore, the mental status at the time of the act must be ascertained before the legal character of the crime is determined. To constitute murder in the first degree, it must be committed willfully, deliberately and premeditatedly. This condition of the mind is proven when death is inflicted by poison or lying in wait for that purpose, but if neither of these circumstances attend the killing, the ingredients to constitute murder must be proved, and the ability of the accused to form a purpose, to think or deliberate, must be considered. The question is not whether there ought to be one law for a sober man and another for a drunken man, nor whether drunkenness will mitigate the criminality of the act, for if a man commits willful, deliberate and premeditated murder, he is guilty,

drunk or sober, and deserves to suffer death, and drunkenness will not excuse or mitigate the offense, if it were done willfully, deliberately and premeditatedly. But the inquiry is whether, in fact, the crime has been committed; and, as the essence of the crime of murder is made, by law, to depend upon the condition of the criminal's mind at the time, all the circumstances ought to be heard in evidence, to enable the jury to decide whether such willful, deliberate and premeditated design existed; and drunkenness is a proper subject to be considered by the jury for whatever it is worth, in determining the state and condition of the mind." This able and clear exposition of the law is well sustained by the recent adjudications in the United States, and the argument in support of that doctrine is so conclusive as not only to justify, but to demand, its adoption, whatever may have been formerly held on the subject.