<hr/>

## The State v. Crawford, *Appellant.*

### Division Two, May 16, 1893.

1. **Criminal Law**: MURDER IN SECOND DEGREE.  The evidence on a trial for murder showed that defendant went into a saloon, and by insulting epithets and refusal to pay for liquor, provoked a fight with the bar-keepers.  After blows had passed, he withdrew to the rear door, about twenty feet; no one was pursuing or molesting him.  Thereupon he drew his revolver and declared, "I've got it now; I thought I had lost it; it holds seven loads."  He began firing and advancing until he was within an arm's length of a spectator who had done nothing, shot him.  Earlier in the evening, when the bar-keepers suppressed an altercation between defendant and another customer, defendant had made threats.  *Held*, that the verdict of guilty of murder in the second degree was fully justified by the evidence.

The State v. Crawford.

2. ———: ———: MALICE. Where the evidence shows that defendant shot deceased purposely and intentionally in a vital part with a deadly weapon, and without any provocation, the requisite malice is presumed, and he is guilty of murder in the second degree.

3. ———: ———: THREATS: RES GESTÆ. Defendant's threats on leaving the saloon after his first visit were part of the *res gestæ* and were competent evidence to show premeditation and malice and his motive in returning to the saloon.

4. ———: ———: KILLING SPECTATOR: SELF-DEFENSE. Where defendant provoked a fight in a saloon with the bar-keepers and deliberately killed a spectator who was standing quietly by, and there was no evidence that the deceased was about to do defendant great bodily harm, defendant cannot complain of an instruction limiting his right of self-defense to a defense of his person from the attacks of the bar-keepers.

5. ———: ———: ———: MANSLAUGHTER. There being no evidence that defendant mistook the deceased for one of the bar-keepers, an instruction that defendant was guilty of manslaughter if he made such mistake and, in a heat of passion produced by blows of the bar-keepers, shot deceased, was properly refused.

*Appeal from St. Louis Criminal Court.*—HON. JAMES C. NORMILE, Judge.

AFFIRMED.

*Charles P.* and *J. D. Johnson* and *C. T. Noland,* for appellant.

(1) The verdict is against the evidence, and must be ascribed to partiality, prejudice, passion or a misunderstanding and misconception of the testimony and the law. In such cases it is the duty of the supreme court, and it will not hesitate, to reverse the judgment. *State v. Benson,* 19 S. W. Rep. 213; *State v. Primm,* 98 Mo. 368; *State v. Castor,* 93 Mo. 242; *State v. Jaeger,* 66 Mo. 173; *State v. McNamara,* 100 Mo. 117, dissenting opinion of Judge SHERWOOD. (2) If the deadly weapon was used in self-defense from a heat of passion provoked by a blow, or if in these two

instances a stranger is killed by accident, no presumption of malice arises, and there is no murder. *United States v. King*, 34 Fed. Rep. 302; *State v. McKinzie*, 102 Mo. 620; *State v. Elliot*, 98 Mo. 151; *State v. Musick*, 101 Mo. 260; Roscoe on Criminal Evidence, 737 *et seq.;* Wharton on Homicide [2 Ed.] sec. 398; 3 Greenleaf on Evidence, 122, *et seq.* (3) If defendant's failure to pay for the wine, and his attempt to strike the bar-keeper for snatching the pitcher away from him constituted defendant the aggressor, and provoked the difficulty, still, his design not being felonious, he had the right of imperfect self-defense, and the jury should have been instructed upon the law governing it. *State v. Partlow*, 90 Mo. 608, and the numerous authorities cited in the opinion; *State v. Berkley*, 92 Mo. 41; *State v. Gilmore*, 95 Mo. 554; *State v. Parker*, 96 Mo. 382; *State v. Herrell*, 97 Mo. 105; *State v. Stiltz*, 97 Mo. 20; *State v. Elliot*, 98 Mo. 150; *State v. Cullen*, 82 Mo. 623; *State v. Hays*, 23 Mo. 287; *State v. Packwood*, 26 Mo. 340. (4) If the shot which killed Stocksieck was fired in a heat of passion engendered by the assaults made on him, it was manslaughter in the fourth degree, if the killing was intentional; and manslaughter in the third degree, if the killing was done with a dangerous weapon without the design to effect death, and the jury should have been so instructed by the court of its own motion. Revised Statutes, 1889, secs. 3471, 3477; *State v. Crabtree*, 111 Mo. 136; *State v. Elliott*, 98 Mo. 150; *State v. McKinzie*, 102 Mo. 621; *State v. Thomas*, 78 Mo. 327; *State v. Berkley*, 92 Mo. 41; *State v. Branstetter*, 65 Mo. 149; Wharton on Homicide [5 Ed.] secs. 4, 5; Bishop on Criminal Law [5 Ed.] secs. 699–701–713. (5) The evidence of a previous quarrel or difficulty between defendant and a stranger, in which deceased took no part and had no

interest, and which occurred some two hours prior to the homicide, and had no connection with it, should have been excluded. Evidence of extraneous misconduct is not admissible, if it violates the above rules. Wharton on Criminal Evidence [9 Ed.] secs. 29 to 32, ·46 to 50; Bishop on Criminal Procedure, sec. 493; *State v. Martin*, 74 Mo. 547; *State v. Nugent*, 71 Mo. 136; *State v. Harris*, 73 Mo. 287; *State v. Reavis*, 71 Mo. 419; *State v. Turner*, 76 Mo. 350; *State v. Parker*, 96 Mo. 382; *State v. Tabor*, 95 Mo. 585–590; *State v. Jackson*, 95 Mo. 649; *State v. Reed*, 85 Mo. 194–197. (6) And if there is a doubt as to the connection between a prior difficulty and the offense on trial, the benefit of the doubt should be given to the defendant, and the testimony excluded. *State v. Tabor*, 95 Mo. 591; *Shaffner v. Com.*, 72 Pa. St. 60; *Peoyle v. Doyle*, 21 Mich. 221. And if evidence of extraneous misconduct is correctly admitted, the court should explain to the jury by instruction that it is limited to the purpose for which it was admitted. *People v. Stout*, 4 Park. Crim. Rep. 127; *State v. Hart*, 66 Mo. 208.

*R. F. Walker*, Attorney General, and *C. O. Bishop* for the state.

(1) The instructions are exceedingly favorable to appellant and he is in no position to complain of them. (2) There was no manslaughter in the case for there was no provocation whatever from deceased and nothing in the evidence makes a case of unintended result. (3) This a clear case of murder upon defendant's evidence, whether he shot deceased intentionally or fired into the crowd, careless of the fact whether he killed him or not. *State v. Edwards*, 71 Mo. 312. (4) It has always been held that on the charge of willful homicide, threats made by the accused of personal

violence are admissible against him for the purpose of showing malice, whether made directly against the deceased by name, or in general, especially when made but a short time prior to the fatal assault. *State v. Guy*, 69 Mo. 430; *State v. Grant*, 79 Mo. 113.

GANTT, P. J.—The defendant was indicted at the January term, 1891, of the St. Louis criminal court. He was tried and convicted at the January term, 1892, of murder in the second degree, and his punishment assessed at ten years in the penitentiary. He was charged with the murder of Henry Stockseick on Saturday night, January 31, 1891.

On this appeal, no question is raised as to the sufficiency of the indictment, the empanneling of the jury, or other preliminary proceeding. The exceptions saved refer to the weight of the evidence, admission of evidence, and the instructions of the court.

To understand the rulings objected to, a substantial statement of the evidence is necessary.

One Schultz kept a grocery on the corner of Sixteenth and Mullanphy streets, to which was attached a saloon. The saloon could be entered from the grocery in front, or by a side door on Mullanphy street, or by a rear door leading into a back yard, from which a gate opened on Mullanphy street. On the evening of Saturday, January 31, 1892, three young sons of Schultz were on duty in the place attending customers of the grocery and saloon. In the latter apartment were several persons seated at a table playing cards, among whom was deceased, a quiet, inoffensive person who lived in the neighborhood, and who made his living by "doing odd jobs." About nine or ten o'clock in the evening Crawford came into the saloon. He was a stranger to everyone present. He was shortly followed by three other young men,—Holden, Gaffney

and Laberman.   Holden was well known to the Schultz boys, and some of the others.   These parties all drank with Crawford.   The latter started a quarrel with some other persons at the bar, which was suppressed by the Schultz brothers, and all of the four went out.   Crawford went out last and as he left he declared that he could "lick any son of a bitch in the place, he didn't care who he was," and pointing or shaking his finger at John Schultz (who was behind the bar), said: "I'll fix you, you son of a bitch, to-night."

At about eleven o'clock the grocery was closed and the lights turned out.   The Schultz brothers were about to close up the saloon also.   The side door on Mullanphy street was locked, as also the front door on Sixteenth street.   The parties playing cards had stopped their game and were standing at the bar taking a parting drink.   The beer keg on tap had been drained and a vessel of beer was set aside for a little party up in front.   John Schultz was behind the bar, having drank his beer.   Crawford came in from the yard through the rear door with a pitcher in his hand.   The young men who had formerly left the saloon with him accompanied him, but remained outside in the yard.   Crawford advanced to the bar, set his pitcher upon the counter, and addressing John Schultz (behind the bar) said: "You —— damned son of a bitch, give me a nickel's worth of beer!"   John replied that the beer was all out, at the same time turning the faucet of the keg to support his assertion.   Crawford then said: "Give me a nickel's worth of milk, then!"   Schultz answered that he had no milk.   Crawford next said: "Well, put p— in it!" or according to another account "G—— damn you, I want something!   P—— in the pitcher!" to which Schultz replied that they didn't do anything of that kind there.   Then a voice from the

outside, recognized as Holden's, cried out: "You Dutch son of a bitch, fill it up with wine, then!" Crawford then directed Schultz to fill the pitcher with wine, at the same time laying a silver coin on the counter, saying: "I've got the stuff to pay for it." Schultz poured wine into the pitcher and set it on the bar, when Crawford took up the money and put it back into his pocket, saying: "You son of a bitch, I won't pay you for this now; I'll see you some other time." With that Schultz seized the pitcher, poured the wine back into the vessel from which he had taken it, and replaced the pitcher on the counter. Crawford caught hold of the pitcher, and, leaning over the bar, endeavored to strike Schultz over the head with it, and there was a scuffle. Rudolph, the brother, stepped forward and struck Crawford with his hand about the head and face. According to different witnesses, the blow staggered him or knocked him down at the end of the bar.

At this time Crawford's friends in the rear made some demonstrations and John Schultz ran to the door and turned the key. Crawford cried out, "Let me out; I want to go home;" and Rudolph helped him to his feet, and it was noticed that he had blood on his face as if his nose was bleeding. He then made a rush at one Wiese, standing there, saying, "You son of a bitch, I'll fix you now;" and Wiese struck him and drove him back. After recovering from the blow, he said: "Johnnie, I didn't think you would do a man that way;" to which Schultz replied "If you give me the money, I'll give you the wine." According to another account he said: "I didn't think you sons of bitches would do me up in that shape;" and according to another still: "I didn't think you would use me this way; I am willing to pay for it."

Crawford then went toward the rear door, about twenty feet, and turning suddenly, exclaimed: "I've got it now, you sons of bitches; I thought I had lost it; it holds seven loads," and drawing a revolver from his hip pocket began firing. Witnesses all agree that he advanced as he fired, and at the third shot was within arm's-length of deceased. This shot was leveled at the head of deceased and was so close as to make powder burns. During all this time deceased had not said or done anything, but simply remained standing quietly at the counter. The bullet went through his head and he dropped dead. During the firing someone outside threw something at the side door and broke the glass in the upper sash. The other parties in the saloon (except Rudolph and John) ran pell-mell into the grocery, and opening the door, got out upon the street. Rudolph seized a beer mallet and threw it at Crawford as he was aiming at his brother; it missed him and struck the wall behind him, making a dent in the plaster. Rudolph next seized a bottle of wine and threw it at him, but also missed him. *These articles were thrown after Stockseick had dropped;* and Crawford was still firing. Crawford called out to John that if he did not at once unlock the rear door he would blow his brains out. John unlocked the door and Crawford disappeared into the yard. Stockseick was found to be dead, and the police were summoned, but no one could tell who Crawford was or where he lived. His companions disappeared at the same time, but as Holden was known, a clue was given which led to the arrest of all four. Appellant was taken into custody at his own house about three hours after the shooting, in bed, awake; he was told what he was arrested for, but made no statement; he had some bruises on his face, and his mother stated to the officer that he was stabbed. He was sent to the city dispensary and thence to the

city hospital.    This all occurred in the city of St. Louis, January 31, 1891.

The testimony on the part of the defense tended to show that Crawford left home early in the evening to go to a ball; that in company with three other men (Holden, Gaffney and Laberman) he spent the evening with a sick friend, one Reardon, a few blocks from Schultz's saloon; that these parties were all "full" when they came to Reardon's house; that they went out five or six times during the evening for a pitcher of beer; that about eleven Crawford went out alone with the pitcher, and after he had been gone fifteen or twenty minutes the others went out to see what had become of him.

Laberman testified:    "We went up in the saloon there; we went to see what was going on up there; we thought maybe he got hurt or something; we went right to Schultz's saloon.    *    *    *    When we went after Crawford we went direct to Schultz's.    Holden says, 'Come on, let's see what's the matter with him;' we went right down to Schultz's expecting if there was anything wrong, that is the place it would be.    *    *    * As soon as I heard shots I went on home, went back to Reardon's first, and then went on home.    We knew our friend Crawford was in there; we thought of it because of the fighting, because Holden seen him when he was going in there before; Holden said he was in there; Holden told me he went up there for the beer; Holden told me he was up there; that's why he brought me up there to see what was the matter with Crawford; I went straight back to Reardon's; I did not go back to see whether Crawford was injured in the scuffle; saw Crawford down on Seventh street, between O'Fallon and Cass avenue, about half past eleven or a quarter to twelve; we saw him sitting

on a bread box; we staid there talking to him about five minutes; Gaffney took him home."

Mother of defendant testified that when he came home, though she does not state what time it was, she saw he was cut in the back and stomach; she sent for her family physician, who came and examined the wound; but he did nothing, gave no advice and went away. A police officer stated that he took him out of bed, and put him in an ambulance; he was unconcious at the time; did not recover consciousness for two days.

Dr. Dalton, superintendent of the city hospital, a witness for the defense, stated *that he was conscious when admitted; was never unconscious at any time while in the hospital, and a couple of days afterward was able to give testimony before the coroner.*

Crawford, when delivered at the hospital early on the morning of February 1, had a scalp wound on the top of his head and a lacerated wound of his lip; he also had a stab wound of the back on the right side, and a serious penetrating stab wound of the abdomen; but there was not a syllable of evidence as to how he received these stab wounds, or who inflicted them; nor was there any testimony as to where he went, or where he was, from the time he left Schultz's till he was met again close by his house; Crawford himself did not testify, nor did Holden and Gaffney.

The motion for new trial alleges three grounds only: *First*, that the verdict is against the evidence; *second*, that the court admitted improper evidence over the objections of the defendant, and *third*, that the court gave improper instructions to the jury.

The jury were instructed on murder in the second degree, manslaughter in the fourth and self-defense.

I. Two of the witnesses for the state, Haverkamp and Steinberger, were permitted, over the objections of

defendant's counsel, to testify to a statement or statements made by defendant as he was leaving the saloon on his first visit to it that night.   At that time defendant had an altercation with a stranger in the saloon, which was suppressed by the Schultz boys.   As defendant left the saloon, he halted at the door, and, pointing his finger at John Schultz, the bartender, he said, "I can lick any damned son of a bitch in the saloon, and I'll fix you," or "I'll fix you, you son of a bitch, *to-night.*"   This visit was, according to one witness, a half of an hour before the one during which he killed Stockseick;   according to others, it was one and a half, or two hours, between the calls.   It is now urged that it was not a part of the *res gestæ*; that the threat was personal to John Schultz and had no connection with his killing of Stockseick; that its tendency was to show defendant was a bad and profane man, and thus indirectly attack his character and was not necessary to identify any one connected with the homicide.

We think the court correctly admitted the evidence. This was a prosecution for murder.   It was incumbent on the state to show premeditation and malace.   What more pertinent proof could have been produced to show both, than this significant threat made by this defendant, who did return on this same  night, and according to the evidence in this record, sought by valgarity and profanity to insult John Schultz, and followed it up by an unprovoked assault;   had he killed John Schultz there could not have been the slightest ground for the objection.   *State v. Forsythe*, 89 Mo. 667;   *State v. Mahly*, 68 Mo. 315.

Nor can it can it be doubted, we think, that it was permissible to show the animus and motive which prompted defendant to return to that saloon that night. *State v. Partlow*, 90 Mo. *loc. cit.* p. 629.

The evidence of his own witness, Laberman, is very significant in this connection. He testifies that the three companions went directly to the Schultz saloon to find him. Holden said, "Come on, let's see what's the matter with him. We went to Schultz's *expecting if there was any thing wrong that is the place it would be.*" He was there where they expected, and evidently had reason to expect, to find him. When he returned to the saloon his conduct was reprehensible throughout. His call for the beer was accompanied by the most insulting epithets and disgusting vulgarity. When he obtained the wine instead of paying for it like an honest man, he replaced the money in his pocket, at the same time remarking, "You son of a bitch, I won't pay you for this now." When John Schultz poured the wine back into the cask and placed the pitcher on the counter, defendant seized the pitcher and attempted to strike John over the head with it. It was then that Rudolph struck defendant with his fist, and knocked him behind the ice chest. When defendant was let up from his encounter with Rudolph, he made an unprovoked attack upon Weise. After all these altercations defendant withdrew to the rear door, about twenty feet. No one was pursuing or molesting him. He then bethought himself of his revolver. He drew it and commenced firing. He leveled it at the head of the unoffending Stockseick, and shot him through the head.

The evidence tended to show that defendant was actuated by spite and malice towards John Schultz; that he was purposely seeking a difficulty with him. The evidence also shows that when the pistol was aimed at Stockseick, Rudolph Schultz was also in an almost direct line with Stockseick. It was perfectly competent for the jury to find that defendant was really trying to kill Rudolph, with whom he had been

fighting.   We hold the evidence was perfectly competent, both to prove malice and premeditation and an unlawful purpose in returning to the saloon, and as a part of the *res gestœ*.

II. It is earnestly urged that the evidence does not sustain the verdict.   We think it does.   There can be no murder in either degree without malice express or implied, but when the evidence shows that the defendant purposely and intentionally shot Stockseick in a vital part with a deadly weapon, without any provocation, the requisite malice is presumed, and he is guilty of murder in the second degree.   *State v. Edwards*, 71 Mo. 312; *State v. Gassert*, 65 Mo. 354.

III. Defendant complains of the instruction given on self-defense.   He complains that the instruction was erroneous in confining defendant's right to shoot and kill Stockseick, to a defense of his person from the assault of Schultz.

We do not think there was sufficient evidence to justify an instruction for self-defense.   It is absolutely certain that Stockseick had not moved or taken any part whatever in the disturbance that defendant had provoked and carried on in that saloon.   In our opinion there is not a word of testimony which could justify the defendant in believing that Stockseick was about to do him great bodily harm, but the learned trial judge, it would seem, out of a spirit of leniency to defendant gave him the benefit of the principle, by instructing the jury that "that if defendant shot at Schultz and killed Stockseick, and when he did so, defendant had reasonable cause to apprehend a design on the part of Schultz brothers and others to immediately take his life or to inflict upon him some great personal injury and that, to prevent such apprehended injury he shot at Schultz, missed him and unintentionally shot Stockseick, and at the time he shot he had reasonable

cause for believing and did believe that it was necessary for him to shoot, to protect himself from such apprehended danger, you will, if from the evidence you so find, acquit him on the ground of self-defense. It is not necessary that the danger should have been actual or real, or that the danger should have been impending and about to fall. It is not necessary that the danger should have been actual or real, or that the danger should have been and about to fall. It is necessary only that the defendant had reasonable grounds for believing and did honestly believe the danger to be so. On the other hand it is not enough that defendant should have so believed. He must have had reasonable cause for so believing. Whether he had reasonable cause for so believing you must determine from the circumstances given in evidence. If, from that evidence you should find that the defendant did not have reasonable cause for believing that at the time he shot at Schultz and killed Stockseick, that the Schultz brothers and others were about to deprive him of life or inflict upon him some great personal injury, you should not acquit him on the ground of self-defense."

There was evidence that Rudolph Schultz was in a line with the shot fired at Stockseick and it was only by the most liberal intendment, and that, from the sole fact that the defendant and Schultz had had a difficulty, that he might apprehend a renewal of hostilities, that any justification can be found for an instruction for self-defense in this case. But if it was allowable the court gave the defendant the benefit of the only reasonable state of facts upon which it could be predicated. As a matter of fact, all the witnesses testify that no one was molesting defendant. He was armed with a revolver. No one was pursuing him.

Of his own volition he pulled it and commenced firing and killed Stockseick. *State v. Gilmore*, 95 Mo. 554.

IV. The instruction for manslaughter in the fourth degree is also complained of. This, like the instruction for self-defense, was based upon the evidence that as Rudolph was in line with Stockseick, perchance he shot at Rudolph and not Stockseick, and if, in a heat of passion produced by blows by the Schultz brothers or either of them, he shot at Schultz, missed him and unintentionally killed Stockseick, he was guilty of manslaughter. We think the evidence did not justify the instruction. The evidence is clear that he deliberately shot at Stockseick, but it was calculated to permit the jury to extend mercy to the defendant. It could not possibly injure him.

His contention that the court should have instructed that if in a heat of passion provoked by the blows of Schultz or Weise, he mistook Stockseick for either of them and fired directly at him, he was guilty of manslaughter, has not a word of evidence to sustain it. There was not a word of evidence tending to show he made any mistake of the kind.

The verdict in this case was fully justified by the evidence. The instructions were exceedingly liberal to defendant. He has no cause for complaint. The judgment is affirmed. SHERWOOD and BURGESS, JJ., concur.