## Ex Parte Louis Evers.

### *No. 7246.   Decided June 3.*

1. **Habeas Corpus—Bail.**—"All prisoners shall be bailable by sufficient sureties unless for capital offenses where the proof is evident." By virtue of this provision of the Bill of Rights the right of bail is secured to all persons in this State who are accused of crime except in cases where the evidence manifests with reasonable certainty that the accused is guilty of a capital offense.

2. **Same — Rule for Determining Right to Bail.** — The rule in this State for determining whether or not bail should be granted is thus declared: "If the evidence is clear and strong, leading a well guarded and dispassionate judgment to the conclusion that the offense has been committed, that the accused is the guilty agent, and that he would probably be punished capitally if the law is administered, bail is not a matter of right." Or as stated in another form: "If upon the whole testimony adduced the court or judge entertains a reasonable doubt whether the relator committed the act, or whether in so doing he was guilty of a capital crime, bail should be granted." This rule applies also when the case is considered on appeal, the court keeping in mind the *prima facie* legal presumption that the action of the trial judge was correct.

3. **Same — Conflicting Evidence.**— It is not all conflicting exculpatory evidence that will have the effect to raise a reasonable doubt of guilt and destroy or impair the force of "evident proof" made by the inculpatory evidence. To the mind of the tribunal passing upon the evidence the guilt of the accused of a capital offense may be evident—that is, clear, strong, not admitting of a reasonable doubt—and yet there may be evidence in conflict with such inculpatory evidence. In such case bail should be refused.

4. **Same — Intoxication — Statute Construed.**—Under the statute of this State mere intoxication or temporary insanity of mind produced by the voluntary recent use of ardent spirits will not mitigate either the degree or the penalty of crime. In a trial for murder, evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant for the purpose of determining the degree of the murder, but evidence of intoxication merely when it has not produced temporary insanity is immaterial, and it is not error to reject it. See the opinion for a thorough discussion of this subject and a review of the decisions upon it, both prior and subsequent to the enactment of the statute.

5. **Same.** — The mere intoxication of the accused at the time he committed the homicide will not entitle him to bail. It has never been held otherwise by the courts of this State, even before the enactment of the statute upon the subject.

6. **Murder — Bail — Evidence.** — See the statement of the case for evidence held sufficient to justify the refusal of bail to one charged with murder.

Habeas corpus on appeal from the District Court of Bexar. Tried below before Hon. W. W. King.

Applicant was charged by indictment in due form with the murder of Robert Richter by shooting him with a pistol. Having been arrested by virtue of a capias issued upon said indictment he applied for and obtained the writ of *habeas corpus.* Upon a hearing of the writ he was remanded to custody without bail.

On the hearing of the writ the following evidence was adduced:

On behalf of the State the bill of indictment was introduced and read as follows:

"*Indictment.* — In the name and by the authority of the State of Texas: The grand jurors of Bexar County, State of Texas, duly ·elected, tried, impaneled, sworn, and charged, at the term of the District Court of the Thirty-seventh. Judicial District, in and for Bexar ·County, beginning on the first Monday of December, A. D. 1890, to inquire for the body of said county of Bexar, upon their oaths, in said District Court of Bexar County, present: That Louis Evers, on the fourteenth day of the month of December, in the year of our Lord one thousand eight hundred and ninety, in said County of Bexar and State ·of Texas, did, with malice aforethought, kill Robert Richter by then and there shooting the said Robert Richter with a pistol, contrary to the statute and against the peace and dignity of the State.

"M. F. CORBETT, Foreman of the Grand Jury.

"Filed December 15, 1890.

"GEO. R. DASHIELL, Clerk District Court Bexar County.

"By HENRY UMSCHEID, Deputy."

Joe Deitch, a witness for the applicant, being duly sworn, testified as follows: My name is Joe Deitch. I am acquainted with the applicant, Louis Evers. I don't know exactly how long I have known him; I think almost a year. I saw Louis Evers on Sunday morning the 14th day of December, 1890, the same day on which Robt. Richter is alleged to have been killed. I saw him I think it must have been about 7:30 or 8 o'clock. I saw him afterward about 9 o'clock. He came to the blacksmith shop where I was that morning. Defendant was drinking that morning. He asked me to go over and have a drink. I saw him drink that morning. He called it whisky. During the time that I saw him he was not exactly sober, and he was not full either. We only took two drinks of whisky together then. I did not see him take any other drinks that morning nor at any other time that day. He had been drinking before I saw him.

Cross-examined: I did not see the deceased, Richter, there that morning. My place is not right opposite Fest's. It is below Frank Frisch's, on Flores Street. The last time I saw him was about 9 o'clock in the morning. I do not know what his condition was as to sobriety at noon that day, at 12 o'clock.

Frank Krisch, Jr., a witness on behalf of applicant, being duly sworn, testified as follows: My name is Frank Krisch, Jr. I live in the city of San Antonio. I am acquainted with the defendant, Louis Evers, the applicant for bail in this case. He has been working for me for about ten months and a half, something like that. This is the defendant [indicating]. He was stopping at that time, Sunday, December 14, the time of the killing of Robert Richter, at my residence. It was somewhere about 1 or 2 o'clock when he left my house that morning. As he was stopping at my residence I would wake him up generally

about 2 or 3 o'clock in the morning. He left a little earlier that morning on account of a serenade I had. I said, "You might just as well get up as you are going to market." That was about 1 o'clock or so. He got up to go to market and he left my house at that time. I saw him again that morning in my market about 5 o'clock in the morning. At that time, 5 o'clock, when I met him, I saw him until somewhere about 8 o'clock. During the time I saw him he was drunk. He was not fit to work. The last time I saw him, about 8 o'clock, he was still in that condition and not fit for anything. He drank whisky. I can't tell exactly how many drinks he took. I drank some drinks with him. The defendant was stopping at my house. I live in the Third Ward west from Fest's saloon, and to the left of Richter's house. My house is between a quarter and a half a mile from Richter's house, perhaps a half a mile. The usual way in going to my house from the city is to go by way of Fest's saloon and then out Garden Street.

Cross-examination: I do not know anything of my own knowledge about the facts connected with the killing of Richter. I know it was whisky that Louis Evers drank because we drank together. I don't know that I drank as often as he did. I don't remember. I don't know how many drinks he took. I was not drunk. The defendant kept his pistols in his room at my house. I don't know how long he had the pistols. He had a large one and a small one. I don't know for what purpose he kept the pistols in his room. He was not in the habit of carrying pistols around with him. I never knew him to carry a pistol at all. Before Richter was killed he came to my house. He did not have his pistols with him when he came. I saw him come in and go to his room and in a few minutes he went out again. I was lying on the bed in the house and did not notice him particularly. He was in his room but a minute. It was about noon. I heard of the killing in the afternoon at the time the defendant was arrested. He was arrested by Jim McClusky. When the sheriff came my family and myself were at the new house, and we went with the sheriff to the old house where Louis had his room. There is a cistern at the corner of the house near the door to Louis' room. As we approached the defendant came from toward his room between the cistern and the corner of the house. He came out with a blanket and said he wanted to go down and surrender. I don't know what his condition was with regard to sobriety at that time. I did not speak to him. I saw the defendant last in the morning when we were drinking, between 9 and 10 o'clock. It was about noon when he came to the room and left again, and it was in the afternoon, perhaps 3 o'clock, or between 2 and 3 o'clock, when he came back and was arrested . I did not notice the defendant particularly and don't know what his condition was when he came to the room about noon. I know there was bad feeling between this defendant and Richter. I know this from hearsay. The defendant never told me that he

intended or wanted to whip Richter. He never told me anything about it. He never told me anything about Richter. I never knew him to carry pistols before that.

Re-direct examination: The defendant did tell me before the killing of Richter that Richter had jumped on him once before from behind and whipped him. It occurred in Richter's yard. He said he had gone there to look at a wagon wheel, and Richter and another man jumped on him and gave him a beating. That is what he told me. The defendant's business was that of a butcher, and as such he had use for his pistols in killing hogs and like purposes. I know he had used them at the butcher pen.

Ed. Zinsmeyer, being duly sworn as a witness, testified as follows: My name is Ed. Zinsmeyer. I am acquainted with the defendant Louis Evers. I know him by sight. He was working for Frank Krisch. I saw defendant about 2:30 o'clock on the Sunday morning of the Richter killing. I saw him in our saloon on West Commerce Street. I was tending bar. He was there until 4 o'clock. He was there with Joe Deitch. He took six or seven drinks of straight whisky. They were medium drinks. At the time I saw him I could not say exactly whether he was drunk or sober. He had been drinking. I sold the drinks and saw him drink, but can not say whether he was drunk or sober. It is plain that he was drinking and he was pretty drunk, but not exactly what I call drunk.

Cross-examination: He was there with Joe Deitch and left about 4 o'clock. Frank Krisch was not with him.

Ludwig Mahncke, being duly sworn as a witness on behalf of the applicant, testified as follows: My name is Ludwig Mahncke. I was acquainted with the deceased, Robert Richter. I have known him for about four years. I know his general reputation in the community in which he lived for quietude. His general reputation in the community was that of a violent and abusive man. I never saw a rougher one than he was. This is his general reputation among those who knew him.

Cross-examination: He was a man that talked a great deal. By a violent man I mean a man who had no more sense than to talk only bad words, curse and swear, and call people sons of bitches and that sort of things. I never had any rows with the deceased. When he came into my place to make rows I kept him quiet. I never had any fuss with him and there was no bad feeling between he and I.

Robert Shaper, being duly sworn as a witness on behalf of the applicant, testified as follows: My name is Robert Shaper. I am acquainted with the defendant Louis Evers. I remember the Sunday that Robert Richter was killed. I saw the defendant Louis Evers that morning at Gotthard's saloon, on Flores Street, between 9 and 10 o'clock. I can not fix the time positively. The defendant was drinking beer. I next

saw the defendant at John Fest's saloon, farther up on Flores Street.
I left Gotthard's saloon before the defendant did. It was about an hour
I guess after I left him at Gotthard's that I saw him at Fest's. When
I saw the defendant at Gotthard's he was not sober and did not seem to
be exactly drunk. The deceased, Robert Richter, was also at Gotthard's
while the defendant was there. I don't think that anything happened
between them at that time. I was there only a few moments. Robert
Richter was at Fest's saloon when the defendant came in. The defend-
ant came in and spoke to Mr. Richter, and said he wanted an explan-
ation out of him for something, I don't remember exactly what. He
said to Richter, "Mr. Richter, I would like an explanation for what
you done to me." They talked awhile. Richter said something, I don't
know exactly the words he used, and it broke out in a little row. We
separated them. They had a row; they fought. They had a little tus-
tle and a wrestle. They were not playing. They had a row there. The
defendant struck Richter and they grabbed each other and wrestled and
fell to the floor. Richter got the defendant down, and while they were
on the floor, with Richter on top, Richter struck the defendant. I saw
him strike him when they were on the floor. We separated them. I
took Mr. Richter and Mr. Gotthard took Louis, the defendant. This
was about 11 o'clock or something near that time. I can't fix the time
exactly. It was shortly before dinner. Richter was a large, heavy built
man. He was tall as I am, and was heavier and stronger. He was a
blacksmith. He was a large, strong man. After the fight between
Evers and Richter, Evers, myself, and a man named Horn went off to-
gether, and Richter went over to Fest's store to telephone for a police-
man. Evers, myself, and Horn went to the San Pedro Springs. We
had started to go where Mr. Horn lived. We were in Horn's wagon.
We staid at the springs a few minutes. We did not take any drinks
there, but I bought a small flask of whisky. After that we went to
Fest's again. At Fest's I saw Richter on the other side of the street
and wanted to talk to him. I went over to him, and while there Evers
came over. Nothing happened at that time. Louis staid there awile.
Richter left and Louis and myself went over to Fest's saloon. During
the time I saw Louis at Fest's he was drunk. After Richter left Evers
remained in the saloon a short while and then he left. At the time he
left he was drunk and crying. He started off toward his home up Garza
Street, at Mr. Krisch's. Krisch's is about four blocks or so from Fest's.
I next saw the defendant Evers when he came back to Fest's. He had
a pistol in his hand and turned it over to me. He pulled the pistol out
of his pocket and gave it to me. I took it and threw it by the side of
the house. From the time Evers left Fest's until he returned was about
an hour. I can't state the time exactly, but that is my judgment. While
the defendant Evers, myself, and Mr. Fest were in the saloon Evers
pulled a second pistol, put it to his head and snapped it twice. I then

jumped and grabbed him and took the pistol away from him and gave it to John Fest. The defendant pointed his pistol against his head and snapped it twice. It failed to fire. From there Evers and myself went to Krisch's house. I wanted to see Mr. Krisch and tell him about it. When we arrived at Mr. Krisch's house Mr. Krisch was not in, but was over at his new house. Evers went to his room and I went over to where Mr. Krisch was. Just at that time the sheriff came up and Mr. Krisch and myself went over with the sheriff and Evers was arrested. As we approached Evers came from his room and passed between the cistern and the corner of the house and came to us with a blanket on his arm. At the time Evers returned to Fest's saloon with the pistols he was still drunk. He looked wild, excited and desperate. He looked like a man dead drunk.

Cross-examination of Shaper: I am an uncle of defendant. I have testified in this case before. I am a carpenter by trade. It was Sunday morning, and I went down there to see Mr. Fest. I first saw Evers about four hours before the shooting, I think; something like that. I saw him at Gotthard's first, something like three or four hours before the shooting, and then I saw him an hour before the shooting when I saw him at Fest's. Richter was in there and Evers came in. Evers said to Richter something similar to this: "You repeat what you said before." Richter had not been in there very long before Evers came in, about half an hour. Richter had his team in front of Fest's store. Fest's saloon is on the opposite corner. Richter was perfectly peaceable and quiet when he was in Fest's saloon. I reckon that that is it, that Evers then came up to Richter and said, "You repeat what you said before." Evers didn't shake his fist. He didn't seem to be very excited at all. Then when Evers said that and Richter made some remark he hit Richter with his fist. I don't know what the remark was. I could not exactly tell the place where he hit him. I think he hit him in the face. He didn't knock him down. It was then that I took Richter away. I separated them. Joe Locke and Chris Gotthard took Evers away. Richter didn't get in his wagon right then and leave. I told Richter to go home. Fest was standing at the store, and he also told Richter to go home. Well, Richter was there in his wagon at the store.. We left; yes, sir, we went over to the store. I was at the wagon and I might have told Evers that Richter did not want to fight him and told Richter to go home. I ain't positive if I stated that way. As a fact they were both at the wagon, and that is the way of it I reckon. I says to let him alone and Richter went on. It isn't true that Evers followed him to the wagon, and when he got to the wagon wanted to fight him. It was in this way: I walked over to the wagon and Evers walked over too—walked over to John Fest's store. I didn't see anything at Gotthard's in the morning about Evers wanting to fight him. I don't know exactly if Evers wanted to fight Richter and Richter didn't want

to fight him, and I don't know exactly that I told Evers that Richter didn't want to fight him. Well, what I told Evers about fighting was to let him alone, and I told Richter the same thing, to go home. They were both there and both talking together. The defendant didn't get mad at me at Fest's when I told him to leave Richter alone, not when he was over there. I can't say exactly that he got mad. He got mad when he left. When Evers got out there he was mad, and he says to me something, I don't know exactly what. He says, "You old shit," or something like that, "you are going back on me." He didn't say he was going to take care of himself. He said nothing more; he went off then. While they were at the saloon Richter's wagon was at the store. Richter left the saloon, crossed the street, and got in his wagon. He didn't get in with me. I started to go home. They were at that time separate. Q. And after they had separated, it was when you told this man Evers to leave Richter alone; that he didn't want to fight him? A. I told both at the same time, as we were standing at the wagon. It wasn't then that Evers got mad and called me a damn shit and said I had gone back on him. . It was quite a while after that I was talking to him, and it was quite a while after that. I couldn't see any arms or any pistols on Evers at that time. The fight occurred in the saloon. After the fight Richter went over to the store, crossed the street, and got into his wagon. I went over to talk to Richter and Evers came over after me. I don't exactly recollect what Evers said to Richter when he followed him over to the wagon. I can not recollect hardly anything. I can't recollect at all what it was Evers said to Richter while Richter was in the wagon that made me tell Evers to leave him alone. The reason why I told Evers to leave him alone was because they were talking together, and I don't know what was said, exactly the words, but they were talking and I thought I would separate them and let them go. Yes, they were separate then. Richter was sitting in his wagon but still didn't go, and so I told both of them to go and Richter went. We all went then from Fest's store. I told Evers right at Richter's wagon to leave him alone. This might have been about twenty minutes after the row I spoke of in the saloon—perhaps longer, twenty-five or something like that. Yes, I think Mr. Fest told Evers at the wagon to leave Richter alone, that he didn't want to fight him. I don't exactly recollect if I heard Fest tell him so. I don't know if I said so a minute ago. I say I said something. It might be that Fest told Evers to leave him alone, because he did speak to him; I don't know. I don't know that I swore it a few minutes ago. I don't know if my memory is good or bad. I heard about the shooting about an hour or so after Richter left. I didn't hear the shots. I was at Fest's when I heard of the shooting. I guess it was close to an hour when I next saw Evers. It was at Fest's. I was still there. He then had two pistols with him, a little one and a big one. I don't know how many shots were fired out of the

big pistol.  He snapped the little pistol at himself, not the big one.   I took the big pistol away from him and threw it away to the side of the house.   Well, I wanted to get Fest's horse for him, that is true.   I wanted to get the horse for him to get off on, and John Fest told me that if I did that I might make myself liable to the law.   I wanted to get a horse for Evers to get off on.   He didn't tell me exactly what he wanted the horse for.   I was going to get the horse without his telling me anything.   I was going to get Fest's horse for him to run away, but when Mr. Fest told me what he did I didn't want to have anything to do with it then.   I then went with him to Krisch's.   I told him to go home.   He didn't have any blankets with him then.   It was a pretty warm day.   I don't know what he got the blankets for.   He went in his room and got them when the deputy sheriff came.   Well, yes, he got them before the deputy sheriff was there.   Me and Mr. McClusky were there all together.   He had just come out in the yard when Mr. McClusky, the deputy sheriff, got there, and had the blankets with him.   The pistol he snapped at himself was loaded.   He snapped it twice.   I don't know anything about the killing of Richter.

Re-direct:   Horn's wagon was standing at the saloon at the time and I got into that wagon and went down to the springs.   All three of us went, and we returned to Fest's afterward.   Then Louis left me and we went home.   There was no difficulty between Louis and Richter at Fest's store—not anything to amount to anything—just words.   No intimation on the part of either of them to get at each other and fight.

Re-cross-examined:   I told my nephew to leave Richter alone, that he didn't want to fight him.   I also told Richter to go home.

Henry Evers, being duly sworn, testified as follows:   I am the father of the defendant.   He is 21 years old.   He will be 22 next May.   He is just 21 past.

August Hencke, a witness for applicant, being duly sworn testified as follows:   My name is August Hencke.   I am acquainted with Louis Evers.   I have known him as long as I can recollect; ever since I was a child.   I remember the Sunday that Mr. Richter was killed.   I saw the defendant on that day.   I saw Mr. Evers about 9 o'clock Sunday morning, December 14, 1890, at Krisch's Convention Hall.   It was between 9 and 10, somewhere about 9 or 10 o'clock, and I saw him in the saloon taking a drink with August Krisch and another gentleman, but I don't recollect who it was.   After they were standing outside a few minutes talking Gus Krisch and I went home.   He had drank some, for he didn't act as he used to do when he was sober.   The next I seen of him was about noon when he passed our house, staggering and crying, I think.   I saw him with a pistol in his pocket.   I saw the handle of the pistol at least.   I was just eating dinner, and as soon as I ate my dinner I got up and got my hat and went to see what was the matter. I knew it was something wrong for him staggering when he passed the

house with a pistol. I followed him; I was about ninety-five or one hundred yards behind him, and when he came up to Mr. Richter's house he stopped. I was in sight of him and could see him when he got there. He went to the fence, and at that time I was about fifty or seventy-five yards from there, and I heard him ask for Mrs. Richter. I don't know whether she was outside or came there, or whether he called her out of the house, and he asked her if Mr. Richter was there. She said, "Yes, he is here, but he ain't going to come out," and told Mr. Evers to go away from there with his pistols, and he said "all right," and walked off. He walked off between fifteen and twenty yards, and by that time I almost reached the place where they had been standing, and Mrs. Richter says, "That man has two pistols, and I want him to go away from here," and then I say "All right, I will try to take him away," and I stepped up to him and says, "Look here, Louis, what are you doing with that pistol? What is the matter with you?" and he says, "Well, I came here to settle with Mr. Richter. He treated me as a dishonorable man and I came here to settle with him." And Mrs. Richter spoke then again, but I don't recollect what she said to Louis, and Louis was crying there, and said he was just as good a man as anybody, and he liked to be treated as good as any man, and that he came here to settle with Mr. Richter either one way or the other. That is the way he spoke to me. And then Mr. Richter came jumping out of the back door. At this time Louis and myself were standing in the street, and I was talking to Louis. Richter came jumping out of his house and says, "Shoot me, kill me if you want to." Louis said, "I don't want to kill you; I have come to settle with you. You treated me bad this morning and I want to settle with you either one way or the other," and Richter then said, "Shoot me if you want to." And then I spoke up and said to Richter, "He don't want to shoot you; he is drunk and don't know what he is doing," and by that time I noticed Mr. Flora. I don't know whether he just come or whether he was standing there, but anyhow I noticed him. I walked up to him and met him right there between the front gate and the corner, the right hand corner—the east corner I believe it was. He saw me and asked, "What is the matter, August?" And I said, "They are talking there and I can't do anything more with them. I tried to keep them apart and I can't do anything more with them," and Mr. Flora said, "May be I can," and I said, "I hope you can," and he walked up to Louis and spoke to him, and I was standing there and doing nothing—just standing and looking about. I was not listening to either party, and Flora spoke to him a while and then spoke to Mr. Richter, and Louis walked off and went to Joe Locke's house. Locke's house is about one hundred and fifty yards away from Mr. Richter's, toward town; down the road, down Garza Street toward Fest's, on the opposite side of the street. Evers went down as far as Locke's house, and when he reached

Mr. Locke's house Mr. Flora and I followed. We turned, and as we turned Mrs. Richter says to her husband, "Leave him alone and come in the house, and he will leave you alone. He is drunk, and he will leave you alone. He won't hurt you if you leave him alone." That is the way she spoke to him. We were standing there, I don't know how long, and Mr. Richter went up to the corner of the fence, but inside of the yard, and said: "Just wait, Uncle Louis; you are a Fredericksburg Dutchman, and you think you can rule a San Antonio Dutchman." and then he said again, "Shoot me," and he (Evers) was just looking up then, and he turned around to come up there again. I said, "I can't do anything more; the best thing for me to do is to leave," and I told Mr. Flora to try his best to keep them apart, for I could not do anything more with them, and I had better go home. I had seen too much already, I said, and I did not like that at all. And so I started off, and then I went home and changed my clothes, and when I was there about a half an hour or so I saw Robert Shaper going out there, and then about the time I reached the place two children, I think, were coming out and somebody in a hack, and they told me it was a deputy sheriff. I was sitting at dinner when Evers passed my house. What caused me to get up from my dinner was because I thought he was drunk. He had a pistol and that was something unusual. I never saw him that way with a pistol and drunk. I saw that he was drinking too much, and I never saw him that way before—that he had a pistol with him and was drunk. I never saw him with a pistol away from the butcher pen. I had seen him with a pistol at the butcher pen, shooting a hog. His appearance at the time I saw him was unusual. He staggered in the street. I could see that from my house. He was dressed with a blue woolen shirt and a sort of striped pair of pants, I think. I am not positive whether it was striped. I don't remember that he had on his coat or whether he had on a vest, but I know he had on a blue woolen shirt, or a dark blue. I saw the pistol on him as he walked by my house; it was in his pocket. I saw the handle of it, and I thought it was a pistol. I just saw one of the pistols then, and when I got up to Mrs. Richter's house she told me that he had two pistols, and I saw two then. He had one in his waistband, and the other in his pocket. I saw one of them, and sometimes he had one in his hand and his pants pocket as he stood there, and he was crying. I didn't know what to think of him, what to make of him. That was when we were standing in the street at Richter's. He was holding his fingers and holding his hands. He was wringing his hands in front of him. I know he was excited; I could see that. He had tears in his eyes and tears running down his cheeks, and I think that is a good sign of a man's crying. Q. Well, I ask you if he was drunk? I will ask you whether or not he was sober or drunk at the time he was talking to Richter and when he went down to Locke's? A. Well, when he was talking to Richter

there why he talked as if he was drunk. I know he didn't have his senses. He didn't act as he used to when he was sober. He was under the influence of liquor. He had drank liquor that morning. I saw him drink one drink, and the way he acted. I can ordinarily tell a drunken man when I see him. He acted like a drunken man. While he was standing out there talking by Mr. Richter's house, in the street, he seemed to be very excited. He seemed to be very excited all the time and wringing his hands, because he was crying, as I showed you. Well, he was not really staggering when he went down to Locke's, but he didn't walk straight either. He just walked down the road right slow. Q. Was he walking straight? A. Why, he walked along the road there. I was not very close, but then I saw him. He didn't walk as straight as he used to. He was not really staggering. I could not swear that he had on a vest. I am not going to swear that he didn't have on a vest, but I know that he had on a blue shirt. He didn't have on any coat. When I spoke to Louis he told me that he had come down there to settle it with Mr. Richter; that he had not treated him as an honorable man; that he wanted to settle it one way or the other. Q. (By the court.) Well, was be angry? Did he speak as an angry man or a quiet man? A. Oh, he was crying and he didn't speak as a quiet man; he talked as if he was angry. He was crying when he said that. He was not speaking unusually loud; not so loud as usual. I said at the time Richter came out of the house Evers and I were standing on the street, and I was talking to him. He had not said or done anything that brought Richter out of the house. He had told Mrs. Richter that he wanted to see Mr. Richter. She told him to go away from there, and he went about fifteen or twenty yards, something like that, in the street, and it was while we were off there talking that Richter came out. He came out of the back door. Richter was holding his shirt open, and said, "Here, shoot me, shoot me, kill me if you want to," baring his bosom. Richter only had on a shirt with short sleeves. I don't know whether it was an undershirt or not, but he only had a shirt on and the shirt had short sleeves. The defendant's remark to this was, "I don't want to shoot you. I just came here to settle with you either one way or the other," and he asked him to come out of the yard and settle with him. I don't remember what Richter's reply was, when Flora and myself told Richter to go into the house and let Evers alone. I don't remember what it was; don't remember what he said. He didn't go into the house when Flora and I asked him to go. He went up to the corner of the fence, the northeast corner, in the direction where the defendant was. That was while Louis was down at Locke's. Richter stood there and shook his fist at him. He said, "Just wait, Uncle Louis, you Fredericksburg Dutchman, you think you can fool a San Antonio Dutchman." That is the way he said it. He was talking tolerably loud. He said, "You Fred-

ericksburg Dutchman, you think you can fool a San Antonio Dutch-man." I said then to Richter, "I can't do anything; the best thing for me is to leave. I can not do anything more."

. Cross-examination: I am 20 years of age. I have known this de-fendant all my life. I am not related to him. I am very friendly with him. I only just knew Richter when I saw him. I don't know much about him. I knew the defendant first in Fredericksburg. I came to San Antonio first in the month of August last; no, it was July. I was living at this time between a quarter and a half mile from where Rich-ter was living, west of Richter, about one hundred and fifty yards from Frank Krisch's. I did not see the defendant when he went to Krisch's to get the pistols. I saw him when he was coming past my house. I did not go in company with him. I followed him about seventy-five yards behind. I did not catch up with him before he got to Richter's. It was at Richter's house that he said he wanted to settle it with him one way or the other. I had no conversation with him on the road. I followed from a quarter to half a mile. I live on this side of Frank Krisch's. I only saw him pass the house with that one pistol. I saw one pistol. Don't know if that was the little pistol or the big pistol. I just saw the handle. I could not see any more. He didn't have it in his hand when he passed the house. He just went up right by my place and right to Richter's house. I did not see him stop anywhere on the road. He had to cross the creek at one time and that was the only time he was out of my sight, not very long. I did not see him stop until he went right to Richter's house, at the side of the house. There is a yard there at the side of Richter's house. He stopped there at the fence, about five or ten yards from Richter's house. He stood there at the fence. I did not hear him call Mr. Richter out. I don't know what brought Mr. Richter out. I was about seventy-five yards behind. I come up to Richter when he was talking to him. I expect it was Richter's own house. The first time that I discovered that the defendant had two pistols was when Mrs. Richter told me and I went up to him and I saw that he had. He had one pistol in his hand; at least he took it in his hand several times, the little pistol. He had the little pistol in his hand. I did not hear him tell Richter to take one pistol and he the other and come out and fight him. I was standing right by Louis and I did not hear that. Richter came out of his own house. I saw a few of his children there; I don't know how many. Richter went to his own gate when he came out of the house. He was never outside of his own inclosure while I was there. He came out in his stocking feet and his undershirt. I didn't see that he had anything in his hands. I didn't see anything in them. I saw him when he threw up his hands and I didn't see anything in them. If he had had anything in them I would have seen it. I was about twenty yards from Richter. I saw him bare his undershirt and tell him to shoot and

kill him if he wanted to. He didn't have anything in his hands that I could see then. When I went up to Evers and told him to go away, and when he told me that he had come there to settle it one way or the other, was soon after I came there and before Mr. Richter came out of the house. Yes, sir, before Mr. Richter came out of the house. Mrs. Richter was out before he said that. I tried to get the defendant to go away because I didn't want him to get into trouble. I didn't know what might happen, he was so excited. He walked down there for a half a mile; he was pretty mad. I don't know what he was mad about. Don't know anything about that. I don't know anything about Mrs. Richter going out of the house to telephone for a policeman. Mrs. Richter was close to Flora when he was there. When I saw the defendant take the pistol out he just held it in his hand. It was not pointed at anybody when I saw him. When he was holding the pistol in his hand he said he was just as honest a man as he was and he didn't like to be mistreated. He was talking to Richter. Mrs. Richter and myself were there and he was talking in the hearing of us all. It was soon after he went to Richter's and after Mrs. Richter came out of the house that he said he went there to settle this thing one way or other. When Mrs. Richter told him to go away he said "all right," and said that he wanted to see Mr. Richter. He didn't say at that time that he wanted to settle it one way or the other; it was right after that, about a minute after. He was then talking to Mrs. Richter. She was the wife of the deceased. I don't know how often Mrs. Richter asked him to go away from there. I can't remember. It was a good many times. I don't know because I was about fifty yards away from there. The first I saw when I got near was Mrs. Richter telling him to go away from there with your pistols; that Mr. Richter was there but he was not going to come out. Yes, the first thing that I heard was Evers asking Mrs. Richter if Mr. Richter was there, and Mrs. Richter telling him yes, but he was not going to come out, and to go away with his pistols. I don't know of her saying anything more about that. I asked him to go away three or four times, and he said in answer to me that he wanted to settle with Mr. Richter, for he treated him as a dishonorable man and he would not stand that, and that he was mistreated and that Mr. Richter treated him as a dishonorable man; that he was just as honest a man as anybody and he didn't want to be treated that way. Q. Did he have the pistol in his hand when he was talking? A. Yes, he did. When defendant took the pistol out he put it back in his pocket, because I saw him. I didn't see anything in defendant's hand when he was walking down toward Locke's. I don't remember whether he had the pistol in his hand at the time that he said he came to settle it either one way or the other. I never saw Mr. Richter there with any arms in his hands at any time. I never saw him outside of his own inclosure. I don't remember that

I ever saw him attempt to get out of it or not. I didn't see Richter in the street. I never saw him on the street while I was there. When Flora came up he asked me what was the racket, or what was the row, or something in that manner, and I told him, "Quarreling in there and I can not do any good there," and he said, "Maybe I can," and I said, "I hope you can," and he stepped up to Mr. Evers and they were talking, and I didn't understand any more. I never tried to get Evers to give up his pistols. I told him to go and leave his pistols, but I didn't want to try to take them from him for he was a stronger man than I, and he was excited and I was afraid of him. I said I only saw him take one drink that morning.

G. L. Flora, a witness for the applicant, being duly sworn, testified as follows: I am acquainted with the applicant. I have seen him. I am not well acquainted with him. I remember the Sunday Robert Richter was killed. I saw the applicant that day. The first time I saw him was at a place on North Flores Street by the name of Gotthard. That was about 10 o'clock or somewhere along there. I also saw him at Richter's house on that Sunday about dinner time. I had been up town that Sunday and I went home on the street car, and I saw Mr. Richter at Fest's with Mr. Evers, at Fest's saloon. I went into Fest's and got something and went home. When I got home I ate my dinner and sat down and was reading. I went up to Richter's house. Richter's little children came running down and said that there was a man that wanted to kill their pa. I went up to Richter's house and I saw August Hencke. He came to meet me, and I said, "What is the trouble here, August?" and he said, "Well, Louis is drunk and him and Richter are having a fuss." I said, "Can't you stop it?" "No," he says, "I have been trying to get Evers away from here, but I can't get him away," and I said, "Perhaps I can get him away," and I went up to the gate. Richter was in the house at that time. I said, "Louis, what's the matter?" and I slapped him on the shoulder. "Well," he said, "Richter gave me dirt and I came to settle it." "Well," I says, "Louis, go away from here; you are getting into trouble here." I saw that he was pretty full and that he seemed to be tight—pretty full of whisky or something—and anyhow I said to him, "You had better leave here," and he said, "Well, I want a settlement with Richter before I leave," and Richter came out and I says, "Look here, Richter, you men make up; you ought not to have any trouble and you can make it up friendly, and not have any trouble here." And Louis walked off and went down to Joe Locke's, and Richter was there hallooing at him occasionally. In the meantime Mrs. Richter had gone to the telephone for a policeman and Richter would halloo down there, and I told him several times, "Mr. Richter, I wouldn't halloo at him; let him go off." Anyhow, I could not keep him from it, and Louis came back. When he came back he says, "I want a settlement; I

want to settle it some way or other." He said, "I am willing to settle it or make it up with you, or I will fight it out with you, or I will shoot it out with you," and he said, "I will give you the choice of pistols." Richter replied, "G—d damn you and your pistols." Well, then they talked a good deal, and it was a big clash of vulgar talk, mostly from Richter, and Louis went off again, started off down the street, and Richter kept hallooing at him. He said, "You are a damned brave man. I will give you five dollars and a half if you will keep guard over my house." And he went on down and Richter kept on hallooing at him, and he was talking to Joe Locke, and by this time Richter had come out of the house. He went to Joe Locke's the second time and came back the second time. That was when Richter told me he was a brave man. And Richter called him a Fredericksburg hoosier Dutchman, and he said, "You imagine you can bullywhack every San Antonio Dutchman," and I tried to keep Richter quiet but I could not do anything with him. And then Evers went down to Locke's and came back to Richter's. By that time Richter was out of the gate talking to me. I was outside of the gate. I tried to get defendant to go home several times, but Richter would call him back. I didn't like to be where there was a fuss going on if I could not stop it, but he would tell me to come back. He did not want me to leave. They were walking up. Evers said, "Richter, did you call me back?" I am not positive what Richter said, if he said anything, but Evers pulled out the pistol —the little pistol. He put that back in his pocket and pulled out a big pistol, and he shot, and I don't know where the first shot went. I think it must have went up, perhaps it might have been a blank cartridge, but we have never found it. It may have bounced off; I don't know. After that Richter ran and at the second shot he fell, and after he fell Mrs. Richter, who was standing in the door, ran out, and by this Louis started off down the street. She ran out and Evers just threw his pistol over and shot in the direction of her. Whether he shot at her or not I do not know, but he hit a china tree. That was the third shot and she ran back to the door. I think the shotgun must have been close to the front door, because she was very quick in getting it, and when he saw her coming he started to run and she fired. I don't think he was ever hit. She fired the shotgun. That is all I know. The shot hit Richter in the back of the neck. Richter's head came very near striking the door step when he fell. The first shot seemed to be a wild shot; it was never located. After the first shot was fired Richter whirled and ran for the door. That was the same door in which the family stood; the same door from which Mrs. Richter got the shotgun. Q. I will ask you, Mr. Flora, during all the quarrel between the defendant and Richter what was Evers (the defendant's) condition with regard to being drunk or sober? A. Well, I think that he was. He was drunk; that is, he seemed to be crying and

seemed to be; seemed to· have a good deal of whisky aboard; that is, he seemed to be in bad condition—that he was drunk.   I don't know what was the condition of his mind as to being cool, calm, and deliberate, or as to being excited and inflamed.   I suppose that a drunken man don't know very much.   He is not quite as sensible as a sober man.   His mind is in an excited condition.   He was crying all the while, that is, seemed to be, and said that Richter had given him dirt and that he didn't want to take it, or something, and I think he spoke something about that Richter had jumped on him in the yard there once before and whipped him.   Yes, sir; he spoke about Richter having whipped him.   Richter's manner toward Evers was rather violent. Yes, he was violent and abusive.   When I first went up there Richter was dressing and had nothing but an undershirt on, and I thought that he was stripped off to fight, and the sleeves were off, and I says, "What is the matter, Richter?" and he says "Nothing."   He says "This fellow wants to shoot me," and he walked out at that time and Evers was out on the road, and he walked out and threw his shirt open and said, "Shoot me, shoot me, shoot me, if you want to; just kill me."   Evers said, "I don't want to kill you; I don't want to shoot you; but I want you to settle with me."   He said, "You have give me dirt and I want to settle it."   He said he wanted to settle it one way or the other.   He said he was willing to make friends, or he was willing to fight about it. That was when he came back the second time.   That is, when he came back the first time from Locke's.   I won't be positive, but I think August Hencke was there at the time, that is, the first time he came back from Locke's.   At the time the defendant said, "I want to settle it with you one way or the other, I am willing to make friends, or I am willing to shoot it out," he didn't have the pistols out.   At the time he said he would give Richter his choice of pistols and fight it out, he didn't then have the pistols in his hands.   That was the time when I appeared.   At the time he made that proposition he didn't have any pistols out.   Had nothing in his hands from the time I came to the house to the time of the shooting, and from the time that Richter came out and to the time of the shooting.   There was no obstacle that would have prevented Louis from shooting him at that time.   During the quarrel I told Richter to go back into the house and let Evers go off.   I told him that several times.   He said he was not afraid of him.   No, sir, he didn't go into the house in response to my request.   Each time the defendant went off he went down toward Locke's.   Locke's is down on Garza Street, on the way to Fest's.   I think it was about one hundred yards from Richter's.   It may have been more.   I never measured it.

Cross-examined: The defendant shot over the fence.   It was a plank fence and a small gate.   When the first shot was fired the defendant might have been five or six feet from Richter.   At the second shot I

think he was in the same place, except that Richter was running—that is, he would be perhaps about eight feet from him. Robert Richter is dead. He died right there. He did not say a word after he was shot. I did not hear him say a word after he was shot. All this happened in Bexar County, Texas. Richter was never outside of his premises at any time. He was standing in his own door when the defendant went down to Locke's first. He was standing in his undershirt and stocking feet. He was dressing when I first saw him. He never did put his shoes on. He was in his stocking feet when he was killed, but not in his undershirt. When I got there he was dressing. I was not there and did not hear what took place when the defendant first called on him to come out. When I first got there Mrs. Richter was there. Mrs. Richter returned from the telephone after Evers got back from Locke's the first time. At the time of the shooting the children were around there somewhere. I could not locate them. I think one was at my house. Yes, perhaps they might have been right around Richter's door. Mrs. Richter was standing at the front door at the time the shots were fired, I think. When Richter was shot his back was toward the defendant. He was shot right square in the back of the neck, a center shot. There was no shot on the door step. His head very nearly struck the step. The gate was shut at the time he was shot. When Evers first went off toward Locke's Richter remarked that he had a shotgun there but had nothing but bird shot in it, and it would not be of any account. I saw Richter with a shotgun in the kitchen. Evers was at Locke's at this time. I never saw Richter bring it out. He didn't have anything in his hands that I saw when he told Evers that he was a nice guard, etc. Richter was standing in his own door when the defendant first went to Locke's. When Richter did the talking I think he was standing in the yard. I said that I saw Richter standing in the door and open his undershirt, and I saw that in the back yard also. He made that remark, "Shoot me, if you want to," several times. He made that remark while he was standing in his own door. When Richter made that remark that he was a good guard he was then in the yard, as well as I can recollect. He was not in the door. This was at the time his wife had gone after the policemen. The way that I happen to know that Mrs. Richter went to the telephone to get the police was because Mr. Richter told me so. He told me that she had gone for the police, but he didn't say that he wanted to hold him. He did not say that when I first went down there. I said, "Louis, you are laying yourself liable, and had better leave." At this time he had two pistols on his person; one was large and the other small. He had a small one in his pocket, and the other one, the large one, in his waistband. I could see the handle of the large one but I don't know that I could see the handle of the small one. When I told him he was laying himself liable and had better go away from there I think he remarked to me that Richter

had given him dirt and that he wanted to settle it. I don't think he
said that to Richter; I think he said it to me. When he said he would
give Richter the choice of either pistol to fight him he was talking to
Richter at that time. He told Richter to step off twenty steps and fight
it out. Richter said in answer to that, "G—d damn you and your pis-
tols. You think you are a Fredericksburg Dutchman and can go around
here and whip a San Antonio Dutchman." It was then that defend-
ant walked off down Garza Street about one hundred yards and stopped
at Locke's. When he went down there it was then I said to Richter I
would let him go. Richter told me he was not afraid of him. When
Evers came back before the shooting Richter was inside of his gate.
The gate was closed and Richter was inside right against the gate.
Evers went to him, perhaps in three yards. He took out the little pis-
tol and looked at it. He took it out of his pocket. He looked at it
and put it back in his pocket, and took out the big one. Well, he had
just taken it out of his pocket and put it back, and then pulled the big
one from there, and when he pulled the big one out, without saying a
word he shot, and then Richter turned around and ran. Then he shot
him in the back of the neck. That was the second shot, when Richter
fell. Richter didn't have any arms in his hands. I went in there.
After he was shot Mrs. Richter came running out, and defendant turned
right around and shot. When he turned around he had walked about,
I think, three or four steps, and she came running out and he whirled
around and shot back. Whether he had shot in that direction or
whether he had taken any aim I don't know. Don't know that he took
an aim at all or not. I saw the position of the parties at the time he
shot at Mrs. Richter. I won't be positive that a china tree was there
between Evers and Mrs. Richter at the time he shot. I saw where the
bullet was in the tree afterward. I could not say whether the tree
was between the defendant and Mrs. Richter or not. After he shot Mr.
Richter she ran in the house and got the gun, and after she got it Evers
ran. Q. He ran pretty well, didn't he? A. Well, I don't know that
he made such a desperate run. He ran. I didn't notice if he ran
staggering and making fence rails, or how. I saw him run, yes. Q.
Did he run like a drunken man? A. You want me to answer that
question, do you? Q. Yes, sir. A. Well, I think really that the man
was tolerably drunk. Q. I ask you if he ran like a drunken man?
A. A drunk man may sometimes, of course, run pretty lively; I have
seen them. But I think he was under the influence of liquor. I can
not answer it, whether he ran like a drunken man. I don't know
really whether he staggered like a drunken man or not. I saw him
running. I was not paying particular attention as I was excited my-
self. I tried to get the defendant to leave when I went up there. I
can't say that I tried to get him to give up the pistols. I don't think
I ever said anything about that; I was not very well acquainted with

him. I don't like to ask men for their pistols, especially if I am not acquainted with them and they are a little tight and drunk. I don't like to deal with them. And I don't think that I ever said that I tried to get him to give them up. The third shot didn't come very far from Mrs. Richter. It would not have been more than three feet no how at the outside. Before the shooting every now and then I saw Evers take his pistols out of his pocket. He would take them out and handle them around. I think I saw him take them out a number of times. I could not say what he was saying and doing when he took them out There was so much spoken by both parties that I can't remember all of it. He took out both of his pistols. I think I saw him with both of them out. That is the way that I come to know that he had more than one.

Re-direct examination: When I first saw defendant he was in shirt sleeves. I don't think I ever asked him for his pistols. To all appearances I think he was excited. He seemed to be; he was crying. It was in the kitchen that I saw the gun first. I saw it when he went up there. When this fellow Evers left the first time I went in the kitchen. Mrs. Richter was gone then, and Richter remarked something about his gun —that he wished he had a good gun. "Oh," I says, "you don't want no gun." I said, "You can settle this thing, no use going to shooting," or something like that. He said well, if he had good buck shot he would use it, but it has got nothing but bird shot in it, and I told him "You had better just let the gun alone, and let him go off." That is the first time I saw the gun. I was then in the back kitchen. It was sitting back of the door. I don't know that I was there when Richter first came out; he might have been out before I got there. He came out of the back way when I first saw him. He came out with his undershirt on. The next time I saw the shotgun was when Mrs. Richter brought it out and fired it. She brought it out from the front door. Richter was in the kitchen when he dressed. He dressed when Evers left the first time, and while Mrs. Richter was gone after the policeman. He put on an overshirt when I went in and a pair of pants. He changed pants, I think. Mrs. Richter was standing in the door at the time the shot was fired which killed deceased, and she ran out in the direction of where the defendant was, and ran back and got the gun. I don't think she had time to go into the back room and get the gun. I think it was pretty close to the front door. It must have been moved from the back door in the rear of the kitchen from the time that the defendant was there first until he came back last time.

Re-cross examination: I went into the house with Richter, into the kitchen, and he was dressing. Evers at this time was at Locke's. The deceased was not hallooing at Evers while he was dressing. I went down to tell my wife to take my children in the house at home, so they could not hear the language. I think I was about twenty steps by this time, and Mr. Richter called me to come back. He told me that he

wanted me to stay there. It was a message from the house of Richter that caused me to go over there. Perhaps Richter might have had hold of the gun while he was in the kitchen. I think he did.. I am pretty positive that he had the gun in his hands while I was in there. He left it in the kitchen when he went out. The last time I saw it was when Mrs. Richter fired. I don't know that we went out of the kitchen together.

Henry Evers, a witness for the applicant, being duly sworn, testified as follows: I live in Fredericksburg. The applicant is my son. He does not own any property. I have got a homestead there in the town of Fredericksburg. I have got a few head of horses and a few head of cattle—about fifty head of cattle and about thirteen or fourteen head of horses, may be fifteen. I don't own any real estate outside of my homestead. Considering what friends I have I think my son can give pretty good bond—a bond of eight or nine thousand, or seven or eight thousand, very easy, I think, from among his friends.

The applicant here rested.

Mrs. Robert Richter, witness for the State, being duly sworn, testified as follows: My name is Mrs. Richter. I am the widow of Robert Richter. He is dead. I was at home the Sunday morning that he was killed. Saw the defendant there that morning. He came up to my house. It was about half past 12 and he had two pistols, and I asked him what he wanted and he said he wanted to see Mr. Richter. I told him if he wanted to see Mr. Richter he should take his pistols away, and he walked off. By this time Mr. Richter had come out of the house. He had come out of the door, and he said, "Louis, what do you want?" The defendant said, "Richter, I want to see you." He said, "Louis, do you want to shoot me?" and he said, "No, Richter, I don't want to shoot you," and he walked off a piece from the house and Mr. Richter then went out of the house and told him if he wanted to shoot him, "Louis, here I am," and he pulled open his shirt. Defendant then walked down to our neighbor's. Before he walked to our neighbor's he pulled out the little pistol and stuck it back again, and I told my husband to go in and put on his shirt and I would go down for a policeman, and I went down and telephoned for the police. What happened between that time I don't know, but when I came back Mr. Richter was standing in the door and Louis was walking backward and forward before my fence. Thence he came back to the door and said all right, and he turned around and walked off again, and Mr. Richter walked from the door to the gate. If Richter said anything to him up to this time I could not tell you, but I know that Mr. Richter walked to the gate, and by this time Evers got back to the gate and he said, "Richter, did you call me back?" and Richter says, "No, Louis, I didn't call you back." And when he said that Evers pulled first a little pistol out, but he put it back again and said,

"That is not good enough for you," and then he pulled out the big pistol and he fired, and after he fired the first shot Mr. Richter dodged and I says, "Louis, don't shoot," and he just raised his pistol and shot again, and the bullet went on past me and hit Mr. Richter in the back of his neck, and then I turned. I says, "Papa, if you are shot he shall have one too," and I ran for the door, and when I went to the door he shot at me, and I grabbed the gun and I shot at him then, but he had the pistol raised at me when I jumped out with the shotgun. He shot at me before I got in the house. My husband never said one word after he was shot. He may have said just one word, or it might have been merely in my imagination, but I think he said, "Bye, mamma." I could not say so for sure, but it just seemed to me that he did say that when he was falling. My children were there at the time of the shooting. My oldest girl, when the shooting commenced, grabbed the child and ran around the house, and my oldest boy was sitting on the fence right where the shooting was. My husband was in his undershirt at the time he was shot. He had on a blue shirt and everyday pair of pants and in his stocking feet. He did not have any arms about him. The gate was shut at the time he was shot. The defendant was near the gate at the time he did the shooting. My husband was standing at the gate. He was standing straight up, sort of slanting, at the time he was shot. I went to the telephone for the police to come up and have him arrested. I wanted to have him arrested.

Cross-examination: When I got the gun it was from the inside of the front door. It was but a short distance from the front door, about a foot. I just went up the steps and reached in and got it. When he fired the first shot I went in between my husband and the defendant and he fired the pistol at my husband and my husband fell, and then I said, "Well, papa, if you are shot he shall have one too," and I ran for the gun. As I ran he fired at me. I was going toward the house for the gun. I got the gun and came out and fired at him. I knew right where the gun was standing. I heard my husband talking to Evers when I went to my neighbor's, hallooing at him. He told him to shoot him so he could look at him. I did not have a word with the defendant. If Richter had any words with him he had it while I was gone. While I was there he didn't have anything with him. He just told him, "Look here, Louis, I can not shoot at you. Look here, here are my little children. If I were to shoot you they would hang me or take me to Huntsville, and I didn't want that on my mind." He told him that he didn't want to shoot him when he first came there. He said, "I don't want to shoot you, Richter." He didn't say while I was there, "I want to make friends with you." I could not tell you if the gun was put there while I was gone to the telephone or whether it was there before I went. I could not tell you that at all. The gun didn't sit there all the time. I don't know if the gun was put there by Mr.

Richter while the defendant went down to the neighbor's. I don't know when it was put there.

John Fest, a witness for the State, being duly sworn, testified as follows: I know the defendant. I knew deceased in his lifetime. I saw the defendant and Richter in the morning of the day deceased was killed. I saw them at my place. I suppose it was about 11 o'clock in the morning. When I saw them that Sunday morning, Richter came over to my place and asked me if he could use my telephone, and I said yes, and so he telephoned down to the police station, and Richter staid at the house about twenty minutes and then he started off, and by that time Robert Shaper came up and Richter drove up and spoke to him. I thought may be he was going to apologize for something and I didn't go out, and at the same time I saw Louis come over and I walked out then, and I didn't want them to raise any row right there, and I told them to quit their foolishness and not to be fighting. I was talking to Bob Richter and Louis. I told them to go away. Richter was then on his wagon. I don't know what Evers said. I said, "Let us go over and take a drink." I told Evers to leave Richter alone, that he did not want to fight. Evers didn't say anything then, but went over to the saloon. When we went over there and took a drink I told Evers that he had better leave Richter alone; that I didn't think Richter wanted to fight him now. We went over to the saloon and got a beer and Louis sort of felt that we were against him because we told him to let him alone. He said, "I believe you are all against me," or something like that, and started out on the gallery and stood there a while and then went off. He said something when he went off but I didn't pay much attention. He said something to the effect that "I believe I can take care of myself." He went off in the direction of Garza Street. It was about an hour after that that I heard of the killing of Richter. What brought me out on the sidewalk to the wagon was that I saw Louis raising his fist, and thought he was going to fight—raised his fist on him; yes, up in the air. Richter was up in the wagon and Evers was down on the ground. He was looking at Richter at the time he raised his fist. I did not hear what he said. I told him to go, that he didn't want to fight right here; that it was no place to fight.

Cross-examination: Yes, sir, the defendant was drunk that day.

No brief for appellant.

*R. H. Harrison*, Assistant Attorney-General, for the State.

DAVIDSON, JUDGE.—"All prisoners shall be bailable by sufficient sureties unless for capital offenses when the proof is evident." Bill of Rights, sec. 11. By virtue of this provision the right of bail is secured to all persons in this State who are accused of crime except in cases

where the evidence manifests with reasonable certainty that the accused party is guilty of a capital offense. McCoy v. The State, 25 Texas, 33; Ex Parte Coldiron, 15 Texas Ct. App., 464; Ex Parte Smith, 23 Texas Ct. App., 100.

The rule in this State for determining whether or not bail should be granted is as follows: "If the evidence is clear and strong, leading a well guarded and dispassionate judgment to the conclusion that the offense has been committed, that the accused is the guilty agent, and that he would probably be punished capitally if the law is administered, bail is not a matter of right." Ex Parte Smith, 23 Texas Ct. App., 125. Stated in another form it is thus laid down: "If, upon the whole testimony adduced, the court or judge entertains a reasonable doubt whether the relator committed the act, or whether in doing so he was guilty of a capital crime, bail should be granted." Same authority, 126. "This rule applies when the case is considered on appeal, the court keeping in mind the *prima facie* legal presumption that the action of the trial judge was correct." Same authority.

"To the mind of the tribunal passing upon the evidence the guilt of the applicant of a capital offense may be evident—that is, clear, strong, not admitting of a reasonable doubt—and yet there may be evidence in conflict with such inculpatory evidence. It is not all conflicting, exculpatory evidence that will have the effect to raise a reasonable doubt of guilt and destroy or impair the force of 'evident proof' made by inculpatory evidence." Same authority.

It would not be proper to discuss the evidence in the case, but tested by the above quoted rules a majority of the court are of the opinion that the facts authorize the judgment rendered refusing bail.

The point relied on for reversal is that the relator was drunk at the time of the homicide, and that therefore there must arise a doubt as to whether the proof is evident of a sufficient intent to justify a capital conviction.

If time sufficed it would be interesting to trace the history of judicial decisions and the laws of the different States upon this question. This, however, we can not do, except in so far as it may serve to illustrate and throw light upon the statutory enactments in this State upon the question. At common law voluntary drunkenness was held to be an aggravation of the crime committed. Coke on Litt., 247; The State v. Hendly, 46 Mo., 419. There were two exceptions to this rule; one where the intoxication is without fault on his part, as where it is caused by drugs administered by an unskillful physician, and the other where indulgence in habits of intemperance has produced permanent mental disease, which is called "fixed frenzy." It has been held in Missouri that evidence of a defendant's condition in regard to intoxication is inadmissible. The State v. Ramsey, 82 Mo., 137; The State v. Deoring, 65 Mo., 532. In Ramsey's case, 82 Missouri, 137, the court

said: "It is also objected that the court erred in refusing to allow a witness to state whether defendant was drunk or sober. Inasmuch as drunkenness neither extenuates nor excuses crime, the ruling of the court was proper." Citing The State v. Hendley, 46 Mo., 419; The State v. Deoring, 65 Mo., 530; The State v. Edwards, 71 Mo., 312. This seems to be the settled rule of that State. In some of the States where there are degrees of murder the fact of drunkenness is relevant on the question whether the killing sprang from a premeditated purpose or from passion excited by inadequate provocation. In some States intoxication is relevant on the question of deliberation and premeditation. In all civilized countries it is held that intoxication is no excuse for crime. In fact there can be no excuse for crime. In this State our Legislature has embodied the law with reference to the effect of intoxication produced by voluntary recent use of ardent spirits in a statutory enactment, which is as follows: "Neither intoxication nor temporary insanity of mind produced by the voluntary recent use of ardent spirits shall constitute any excuse in this State for the commission of crime, nor shall intoxication mitigate either the degree or penalty of crime, but evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant in any criminal prosecution in mitigation of the penalty attached to the offense for which he is being tried, and in cases of murder for the purpose of determining the degree of murder of which the defendant may be found guilty. Sec. 2. It shall be the duty of the several district and county judges of this State, in any criminal prosecution pending before them where temporary insanity is relied upon as a defense, and the evidence tends to show that such insanity was brought about by the immoderate use of intoxicating liquors, to charge the jury in accordance with the provisions of section 1 of this act." Gen. Laws 17th Leg., Reg. Sess., p. 9; Willson's Crim. Stats., sec. 92. This law changes the rule in this State as to the effect of drunkenness upon the degrees of murder. In the case of Ferrell v. The State, our Supreme Court said: "The correct rule upon the subject is that although drunkenness neither aggravates nor excuses an act done by a party while under its influence, still it is a fact which may affect both physical ability and mental condition, and may be essential in determining the nature and character of the acts of the defendant as well as the purpose and intent with which they are done." 43 Texas, 508. This court said in Colbath's case that "while intoxication *per se* is no defense to the fact of guilt, yet, when the question of intent and premeditation is concerned, evidence of it is material for the purpose of determining the precise degree. In all cases where the question is between murder in the first or murder in the second degree the fact of drunkenness may be proved to shed light upon the mental status of the offender, and thereby to enable the jury to determine whether or not the killing resulted from a deliberate and premeditated purpose." 2

Texas Ct. App., 395, 396. In Brown's case this court further said that "after a careful examination of authorities, both English and American, we have held that voluntary intoxication is no excuse for crime; that it will not reduce an act which in a sober man would be murder to manslaughter. The mere fact of the accused being drunk will not mitigate the criminality of a voluntary killing below the grade of murder. In all cases where the question is between murder in the first and murder in the second degree the fact of drunkenness may be proved to shed light upon the mental status of the offender, and thereby enable the jury to determine whether or not the killing resulted from a deliberate and premeditated purpose." 4 Texas Ct. App., 291. Again it was said: "Evidence of intoxication or drunkenness is of vital importance only in the class of offenses in which criminality depends solely, or to a certain degree, upon the state or condition of the mind at the time the wrongful act is done, showing the ability or inability of the mind to form or entertain a sedate or inordinate criminal design." Gaitan v. The State, 11 Texas Ct. App., 562.

A sufficient number of the decisions of the courts of last resort in this State have been quoted to show plainly and clearly what the law was prior to and at the time of the enactment of the statute above quoted. It will be seen that the evidence of drunkenness was, in cases of murder, held admissible upon the question of degrees in that offense. The statute was enacted with reference to these decisions because they constituted the law, at the time of its enactment, on this subject. In whatever respect the statute may or does differ from these decisions it must be held to override them, and to that extent change the rule upon the subject in this State. A casual glance at the said statute manifests the intention of the Legislature to be that intoxication shall not "mitigate either the degree or the penalty of crime." It is also to be seen that in cases of murder "evidence of temporary insanity produced by such use of ardent spirits may be introduced by the defendant for the purpose of determining the degree of murder of which the defendant may be found guilty."

Viewing the statute in the light of the previous decisions, the language employed therein, and the evident intention of the legislative mind to be gathered therefrom, we are of the opinion that the only construction that can be placed thereon is that since the passage of that law evidence of drunkenness alone will not be admitted for the purpose of mitigating murder from the first to the second degree. It is manifest from the statute that in cases of murder the party accused stands before the law to be tried without reference to his mental or physical condition with reference to drunkenness, if the intoxication be caused by the "voluntary recent use of ardent spirits," and such intoxication does not reach the stage of temporary insanity. This is not a novel question in this court. This same question came up for decision in Clore's case, in which

this court said: "We think it clear that the legislative intention was, first, that mere intoxication from recent use of ardent spirits should not of itself in any case excuse crime; second, that mere intoxication should neither mitigate the degree nor the penalty of crime; third, temporary insanity produced by such use of ardent spirits is evidence which may be used in all cases in the mitigation of the penalty and also in murder, for the further purpose of determining the degree. Of itself intoxication is neither a justification, mitigation, nor excuse of any sort of crime. It must go to the extent of producing temporary insanity before it will be allowed to mitigate the penalty, and in murder, before it can be considered in determining the degree. This is our understanding of the proper construction to be placed upon the language of the statute." Clore v. The State, 26 Texas Ct. App., 629, 630.

It will be observed that the statute has no reference to drunkenness other than voluntary, nor does it refer to insanity other than temporary, and such only as is produced from such use of "ardent spirits." The construction herein placed on this statute is believed to be in strict accord with the legislative will and intention, and the only construction that can be legitimately placed thereon. It is a fundamental principle that in the construction of a statute the legislative intent, if that intent can be ascertained, must govern. The design of all rules of construction of statutes is to furnish guides to assist in arriving at the intention of the Legislature. Willson's Crim. Stats., sec. 17; Whitten v. The State, *ante,* 504.

The statute before us hardly needs construction. Its language is plain and its purpose easy of access, and lies on the surface of the terms employed. The mere fact of intoxication at the time of a homicide will not affect the crime nor the degree of murder in this State as the law now stands. Clore v. The State, 26 Texas Ct. App., 629, 630; Willson's Crim. Stats., sec. 92.

Temporary insanity was not claimed as an issue in this case in the trial below, nor is it an issue here as the case is presented to us. The whole of this phase of the case turns upon the question of intoxication produced by the voluntary recent use of ardent spirits, and the effect thereof upon the relator at the time of the homicide. But suppose we omit the statute quoted from the discussion and view this case from the standpoint of the law as it was prior to the enactment of said statute, still the result of the case in our opinion must be the same. In passing upon the evidence the court will consider it as a whole, and if by the entire evidence a reasonable doubt of the applicant's guilt of a capital offense is not generated the proof is evident and bail should be denied. It is not all conflicts in the evidence that requires the granting of bail. Nor is it all stages of drunkenness that would be considered in determining the degree of murder. The fact that the slayer was intoxicated does not indicate that the homicide was not done in a

cool and deliberate manner. A drunken party can commit the crime of murder with as much deliberation and in as heartless and cruel manner as the most sober man. The simple fact of intoxication has never been held to exonerate from crime, nor even to mitigate it, nor to become evidence favorable to the party accused if the other facts show coolness and deliberation. Intoxication, which is a wrong in and of itself, has never been held to have the effect of being excusing cause for another and greater wrong. A party can not be heard to plead his first wrong or crime in justification of a subsequent offense. No man will be heard to take advantage of his own wrong. In order to have any effect favorable to the accused, the state of mind caused thereby must be such that his capacity to appreciate the enormity of his crime has been obscured, if not totally destroyed. Under the law as it was aforetime, should we relegate the decision of this case thereto, in so far as the question of drunkenness affects it, we arrive at the same conclusion. Under our former decisions it is evident that the trial court arrived at a correct conclusion in this case. Prior to the statute of the Seventeenth Legislature the courts of last resort in this State have never gone further than to hold that evidence of intoxication might become essential in determining the degree of murder, or to show a want of criminal intent. It has never been held that because a party was drunk that he would thereby be exonerated from punishment, nor that his crime would be reduced to an inferior degree. Nor has it ever been held that the mere fact of intoxication would demand the granting of bail. Our courts have never held that when a killing is shown to have occurred in such manner as to constitute murder upon express malice, that the fact that the slayer was drunk would reduce his crime to murder of the second degree.

Whether we view this case from the standpoint of the law as it was prior to the passage of the statute or subsequent thereto, our conclusion is the same, and we are of the opinion that the judgment is correct, and it is affirmed and bail is refused.

*Affirmed.*

Judge Hurt dissents.